United States Court of Appeals,

Eleventh Circuit.

No. 95-9262.

Sharon BENNETT, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Dec. 30, 1996.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV194-083), Dudley H. Bowen, Jr., Judge.

Before DUBINA and BLACK, Circuit Judges, and MARCUS[*], District Judge.

MARCUS, District Judge:

Plaintiff-Appellant Sharon Bennett appeals the district court's grant of summary judgment in favor of the Defendant-Appellee United States of America. Bennett brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.,* alleging that she suffered permanent injuries due to the negligent conduct of a United States Army soldier stationed at Fort Gordon in Augusta, Georgia. Bennett's injuries resulted from the soldier's discharge of a handgun that, in violation of base regulations concerning privately-owned weapons, had not been registered with the base Provost Marshal's office. The United States moved for summary judgment, arguing, among other things, that the soldier was not acting within the scope of his employment at the time of the incident, and therefore no liability could be imposed under the FTCA. The district court agreed that

---

[*]Honorable Stanley Marcus, U.S. District Judge for the Southern District of Florida, sitting by designation.

the soldier had not acted within the scope of his employment. Bennett insists that the district court erred in reaching this and other conclusions concerning her negligence claim. For the reasons detailed below, we affirm.

## I. Background

This case arises out of an accidental shooting on the night of January 14, 1993. Early in the evening, David Williams, a soldier assigned to Company A of the 551st Signal Battalion at Fort Gordon and residing on the base, attended the rehearsal of a band of which he was a member. During the rehearsal, Williams told a fellow soldier and band member, Adrian Risby, that he planned to visit a local dance club later that night. Risby indicated that he would like to go, and the two servicemen arranged to meet at Risby's barracks room. Shortly after 11:00 p.m., Williams, off-duty at the time, left his residence to meet Risby. When he arrived at Risby's quarters, Williams was carrying a black nylon bag that concealed a personal .380 caliber semi-automatic pistol. Bennett, an acquaintance of both soldiers and a guest of Risby's, was in the room along with Risby when Williams arrived. The trio discussed which night club to visit and other plans for the evening. At some point during the conversation, Williams removed the pistol from his bag and inadvertently fired it. The bullet struck Bennett in the back and severed her spinal cord, causing permanent paralysis below her upper waist. Williams subsequently pled guilty at a court martial in June, 1993 to charges of assault with a dangerous weapon, negligent discharge of a loaded firearm and carrying a concealed weapon.

Seeking to recover money damages for her injuries, Bennett submitted an administrative claim to the Department of the Army. After the Army denied her claim, she filed the instant FTCA lawsuit against the United States on May 18, 1994. In her complaint, Bennett alleges that the negligent acts of Williams may be attributed to the United States on a theory of vicarious liability, since Williams acted within the scope of his employment as a United States Army soldier. Bennett also alleges that the Government was liable for failing to adequately supervise the dormitory where she suffered her injuries, and that Williams and other Government employees exacerbated her injuries by moving her immediately after the accident. The United States answered the complaint, and thereafter moved to dismiss or in the alternative for summary judgment. In an Order dated September 29, 1995, the district court assumed that Williams' negligence caused Bennett's injuries, but accepted the Government's argument that Williams had not been acting within the scope of his employment at the time of the shooting. The district court also concluded that the Army did not willfully or wantonly fail to supervise the barracks. In a subsequent Order, the court rejected as a matter of law Bennett's claim that Army employees aggravated her condition, since neither Williams nor Risby acted within the scope of their employment and no evidence had been produced to show that any other employees improperly moved her after the shooting. Bennett appeals the district court's findings on these issues.

## II. Standard of Review

The district court construed the Government's motion as an

application for summary judgment.[1]  We review the district court's grant of summary judgment *de novo.  Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1404 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 906, 130 L.Ed.2d 788 (1995).  A summary judgment motion should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).  An issue of fact is "genuine" if the record as a whole could lead a rational trier of fact to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  An issue is "material" if it might affect the outcome of the case under the governing law.  *Id.*  Like the district court, we review the evidence in a light most favorable to the non-moving party.  *Griesel v. Hamlin,* 963 F.2d 338, 341 (11th Cir.1992).

---

[1]The FTCA operates as a limited waiver of the United States' sovereign immunity.  *See, e.g., Lawrence v. Dunbar,* 919 F.2d 1525, 1528 (11th Cir.1990).  Unless the United States may be held liable pursuant to the terms of the statute, the sovereign's immunity remains intact, and no subject matter jurisdiction exists.  *Id.*  Rule 12(b)(1) of the Federal Rules of Civil Procedure provides a vehicle for the dismissal of actions for lack of subject matter jurisdiction.  Nevertheless, where—as here—the existence of subject matter jurisdiction is inextricably intertwined with material facts affecting the merits of the claim, a district court must be guided by the standard for summary judgment motions under Fed.R.Civ.P. 56.  *Id.* at 1528-30; *Green v. Hill,* 954 F.2d 694, 697-98 (11th Cir.), *withdrawn and superseded in part on reh'g,* 968 F.2d 1098 (1992);  *Eaton v. Dorchester Dev., Inc.,* 692 F.2d 727, 734 (11th Cir.1982).

## III. Discussion

The principal question presented in this appeal concerns language in the FTCA that makes the United States' vicarious liability for the negligence of its employees contingent on whether the employee acted in the "line of duty."  The FTCA waives the Government's sovereign immunity for civil damages lawsuits against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  The statute defines "employee of the government" as including "members of the military or naval forces of the United States."  For military personnel, "[a]cting within the scope of ... employment" means acting in "line of duty."  *Id.*  "Line of duty," in turn, draws its meaning from the applicable state law of respondeat superior, *Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955) (per curiam), taking into account the special factors and characteristics of military activity and discipline.  *See, e.g., Bettis v. United States,* 635 F.2d 1144, 1147 (5th Cir. Unit B 1981);  *Hinson v. United States,* 257 F.2d 178, 181 (5th Cir.1958).[2]

---

[2]In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals handed down prior to October 1, 1981.  This Circuit also regards as binding precedent all decisions of Unit B of the former Fifth Circuit.  *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

Since Williams' alleged negligence occurred in Georgia, we look to Georgia's law of respondeat superior. While respondeat superior is a slippery concept that eludes precise, universal definition, Georgia courts will hold an employer responsible for the conduct of its employee if the employee acted in the course of the employer's business and with a desire to benefit the employer. *See Green,* 954 F.2d at 698 (noting that, under Georgia law, "[t]he tort of an employee is within the scope of his employment if it is done in furtherance of his employer's business"); *Wallace v. ARA Servs., Inc.,* 365 S.E.2d 461, 463 (Ga.Ct.App.1988); *Wittig v. Spa Lady, Inc.,* 356 S.E.2d 665, 666 (Ga.Ct.App.1987); *Southern Bell Tel & Tel Co. v. Sharara,* 167 Ga.App. 665, 307 S.E.2d 129, 131 (1983). By contrast, when an employee undertakes an act purely personal in nature, no respondeat superior liability may be imposed. *Green,* 954 F.2d at 698; *see Worstell Parking, Inc. v. Aisida,* 212 Ga.App. 605, 442 S.E.2d 469, 470-71 (1994) (refusing to hold employer liable for acts of a parking attendant who struck a customer with a stick, and concluding that the employee's "altercation with plaintiff and her boyfriend appears to have been purely personal and not for any purpose beneficial to defendant"); *Wallace,* 365 S.E.2d at 463 (refusing to hold employer liable for injuries resulting from an employee's unauthorized use of a company van for personal errands); *Wittig,* 356 S.E.2d at 666 (finding that employee who forged a purported customer's signature on a company contract acted outside the scope of her employment). The question of whether a given act falls within the scope of employment is highly fact-specific, and turns on the unique circumstances of the

case at bar.  *See, e.g., Wallace,* 365 S.E.2d at 463.

At the outset, Bennett seems to suggest that each and every act by a military employee in or around military housing necessarily falls within the scope of a soldier's employment.  She describes a military base as a "special type of business locale" that is "open for business" at all times.  She further maintains that since soldiers may be called to duty on a moment's notice, all of their activities relate to or are limited by their employer's purpose.  These arguments are unpersuasive.

We are aware of no case law from this Circuit or elsewhere to support so sweeping an application of respondeat superior under the FTCA.  To begin with, a great many acts by military personnel who reside on base may be sufficiently outside the scope of their employment to preclude vicarious liability on the part of the Government.  In *Bettis v. United States,* for example, the former Fifth Circuit held that an off-duty Army soldier who caused an accident while driving an Army vehicle off-base was not acting within the scope of his employment.  The soldier had driven the vehicle to a nearby party.  A superior officer attending the party gave the soldier permission to drive the vehicle back to his barracks.  The soldier understood, however, that he was not permitted to take the vehicle off base at any time without permission.  Nevertheless, after returning to his quarters, he used the vehicle to drive to a neighboring town to see a girlfriend. The accident occurred during this frolic.  The district court entered summary judgment in favor of the Government, holding that the soldier had used the vehicle without authority and for his own

personal reasons.  The former Fifth Circuit affirmed, holding that since the soldier's "trip from beginning to end was totally unauthorized, he was not acting in the scope of his employment." *Id.* at 1148.  As *Bettis* suggests, evidence that a negligent act is attributable to a soldier who lives in military housing may be insufficient to support the imposition of respondeat superior liability.

Dictum from the United States Supreme Court's opinion in *Sheridan v. United States,* 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988) underscores this conclusion.  *Sheridan* concerned a serviceman who impermissibly kept a rifle and ammunition in his barracks at a Navy medical center.  After becoming intoxicated, the serviceman walked to the edge of the base and began shooting at passing vehicles on a public street.  In the course of its opinion, the Court remarked that the serviceman's conduct, standing alone, did not provide a basis for imposing liability on the United States, even though the tortfeasor lived in military housing and committed his tortious acts while on base property.  The Court stressed that the "tortious conduct of an off-duty serviceman, not acting within the scope of his employment, does not in itself give rise to Government liability...."  *Id.* at 401, 108 S.Ct. at 2455. *Sheridan,* like *Bettis,* suggests that even if the alleged tortfeasor is a member of the military, and commits the allegedly negligent act on base property, it may not follow that the soldier has acted within the scope of his employment.[3]

---

[3]Bennett cites the Second Circuit's opinion in *Taber v. Maine,* 67 F.3d 1029 (2nd Cir.1995), for the proposition that the military's pervasive control over the activities of its personnel

There is no dispute that Williams was off-duty at the time of the alleged incident. There is also no dispute that Williams visited Risby's quarters on the night of January 14, 1993 for purely personal reasons unrelated to his responsibilities as a soldier. As the district court observed, Williams' subsequent discussions with Risby and Bennett about which night club to visit "fail to bear even the faintest connection with his duties as an employee of the United States Army." Nor can Williams' possession or concealment of the firearm prior to or during the night of January 14th be linked in any way to his duties as a member of the armed forces. In a statement given to military authorities, Williams acknowledged that he carried the gun "just for common practice. With all the things going on you never know who or what

supports a broad application of respondeat superior. *Taber,* an FTCA case arising under Guam and California law, involved an off-duty soldier who became intoxicated after drinking alcoholic beverages at several base parties and on-base recreation centers. The soldier subsequently struck and injured another soldier while driving a vehicle off-base in search of a late-night snack. In reversing the district court's finding that the intoxicated soldier had not been acting within the scope of his employment at the time of the accident, the Second Circuit explained that, under California law, respondeat superior liability is proper whenever the employee's "conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* at 1036-37 (citation and emphasis omitted). The panel treated the damage resulting from the intoxicated soldier's conduct as one of the "costs of base operations" properly allocable to the Government, especially since the military's "fairly lenient on-base drinking policies" benefitted its interest in boosting soldiers' morale. *Id.* at 1037. *Taber* acknowledges the expansive nature of California's respondeat superior law. *Id.* at 1034-35. But even if we were to assume that the standard applied in *Taber* could be squared with the more limited reach of the doctrine in Georgia, the Second Circuit's opinion provides little guidance on the issue before us. In particular, the Army did not provide Williams with the weapon used to injure Bennett, or in any way encourage or facilitate his acquisition, retention or concealment of the gun.

you are going to run into." R3-Exh. 1. Quite simply, none of Williams' acts on the evening of the shooting furthered, or were intended to further, his employer's purpose.

Bennett nevertheless argues that since Williams' possession of the handgun implicated a base regulation that imposed certain affirmative duties on him, his obligation to discharge those duties may be considered within the scope of his employment. Bennett contends that the United States' "employee's actions, in possessing, carrying and concealing a personal firearm, were in violation of Fort Gordon security regulations.... [and] suggests the existence of vicarious liability." Appellant's Br. at 12. Fort Gordon regulation 210-13, which relates to the "Control of Firearms, Ammunition, and Other Dangerous Weapons," expressly limits the kind of weapons that may be brought onto the installation. Among other things, the regulation requires that all privately-owned weapons be registered with the Provost Marshal's office within three days after arrival on the base, subject to certain exceptions not applicable here. R3-Exh. 4. The regulation also forbids the carrying of concealed weapons. Violators of the regulation are subject to military punishment.

As support for her position, Bennett places great emphasis on the Ninth Circuit's analysis in *Lutz v. United States,* 685 F.2d 1178 (9th Cir.1982). In *Lutz,* the plaintiffs sought to hold the Government liable for injuries attributable to an Air Force soldier who failed to properly control his dog. Soldiers living in base housing were permitted to own pets, but were required to comply with a base regulation that directed pet owners to control their

animals. The Plaintiffs alleged that the soldier's negligent handling of his dog allowed the dog to attack a small girl playing in a nearby yard. The district court found that, by bringing his pet on base, the soldier did not act in the line of duty, but rather for his own benefit. As a result, the court concluded, no respondeat superior liability could be imposed under the FTCA. On appeal, the Ninth Circuit reversed, holding that since the soldier "was delegated a specific military duty, the performance of which furthered the interests of the Air Force," he acted in the line of duty and within the scope of his employment. *Id.* at 1183. In reaching this conclusion, the Ninth Circuit acknowledged that not "every act of a base resident is within the scope of his employment." *Id.* It nevertheless suggested that "[m]ilitary housing presents a unique situation. Unlike employees and residents of cities and towns, the employment relationship of residents of military bases continues even during the off-duty, at-home hours." *Id.*

The holding in *Lutz* has been rejected by three of our sister Circuits and several district courts. *See Chancellor v. United States,* 1 F.3d 438 (6th Cir.1993); *Piper v. United States,* 887 F.2d 861 (8th Cir.1989); *Nelson v. United States,* 838 F.2d 1280 (D.C.Cir.1988); *Stanley v. United States,* 894 F.Supp. 636 (W.D.N.Y.1995); *Brotko v. United States,* 727 F.Supp. 78 (D.R.I.1989). These opinions recognize that some regulations governing the conduct of military personnel simply do not impose requirements within a soldier's "scope of employment." In *Nelson,* for example, the court considered a regulation almost identical to

the one at issue in *Lutz.* The regulation required pet owners to control the animals they kept on the base. Plaintiffs alleged that an Air Force soldier living on the base failed to prevent his dog from attacking a neighboring child. The district court entered judgment against the Government, partly on a theory of respondeat superior and relying heavily on *Lutz.* The Court of Appeals affirmed the judgment, but rejected the district court's respondeat superior analysis. In so doing, it criticized the Ninth Circuit's reasoning:

> Under *Lutz,* all duties imposed by military regulation, no matter how trivial, could fall within the employer-employee relationship. In the unique context of life on a military base, however, the government is much like an old-fashioned "company town." Within this multi-faceted relationship, the military imposes duties on personnel, not all of which are plausibly viewed as imposed by the government in its role as employer.... Because such duties, although established by military regulations, do not run to the benefit of the employer and are linked only incidentally with the employment relationship, they cannot be said to be discharged within the scope of employment.

*Id.* at 1283-84. The court added that the Ninth Circuit's opinion provided no limiting principle on the Government's vicarious liability, effectively making the United States an insurer for an entire universe of bizarre accidents that might occur on a military installation:

> Military regulations typically govern a wide range of base residents' activities, touching most aspects of private and public life. To hold the government potentially liable for all damage done on a military base that violates any one of the many base regulations would expand liability in ways inconsistent with the idea that the FTCA must be strictly interpreted as a limited relinquishment of sovereign immunity.

*Id.* at 1284.

To the extent that *Lutz* can be read to suggest that every duty imposed by base regulations falls within the employer-employee

relationship as a consequence of the military's pervasive interest in fostering order and discipline, we think the Ninth Circuit's opinion sweeps too broadly. *Lutz* imposes on the United States a risk of respondeat superior liability far beyond that of its private employer counterparts. We need not equate military housing with a "company town" to recognize that while providing on-site residences for soldiers may foster camaraderie, encourage discipline and facilitate rapid mobilization in the event of a crisis, it does not draw the entire panoply of soldiers' on-base activities within the ambit of the employment relationship. The connection between military service and trivial or housekeeping regulations that benefit the military's purpose only in an indirect sense may be far too tenuous to trigger vicarious liability under the FTCA. And while *Bettis, Hinson* and other Circuit precedents do suggest that the concept of "scope of employment" must be tailored to the "special factors and characteristics of military activity and discipline," these opinions nevertheless confirm that Congress, when it waived the United States' sovereign immunity for FTCA lawsuits, did not intend to sever the concept of respondeat superior liability from its common law moorings. *See* 28 U.S.C. § 2674 (providing that the "United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances").

It follows that the existence of a base regulation governing the manner and method of Williams' personal possession of the handgun does not draw compliance with that regulation within the scope of his employment. The regulation at issue in this case,

which pertains to private weapons that individuals may elect to bring onto the base, bears a highly attenuated relationship to the Army's purpose. Notably, the regulation applies not just to soldiers, but rather to all individuals on the premises of Fort Gordon. At the same time, the regulation does not apply to servicemen who keep weapons off-base. The existence of the regulation cannot, standing alone, convert a soldier's private act of carrying a personal firearm into conduct somehow designed to further or benefit his employer's purpose.

Our conclusion is not inconsistent with the former Fifth Circuit's opinion in *Craft v. United States,* 542 F.2d 1250 (5th Cir.), *reh'g denied,* 546 F.2d 906 (1977). *Craft* concerned an Army soldier who inadvertently injured the child of a neighboring family while mowing the lawn surrounding his assigned residence at a military installation in Alabama. The soldier had been given on-post housing in a multi-unit complex where the child lived with his parents. Upon taking up residence, the soldier was advised that he would be required to maintain the grounds immediately surrounding his apartment. Base regulations governed the manner and method by which the soldier was expected to maintain the lawn. The soldier was given verbal and written instructions regarding lawn care, and his yard work was inspected by Army officials. It was in the midst of cutting his assigned portion of the lawn that the soldier struck the child with the lawn mower.

The child and her parents thereafter filed suit against the Government under the FTCA. The Government moved for summary judgment, arguing that the soldier was not acting in the "line of

duty" at the time of his allegedly negligent conduct. The district court agreed, and entered judgment in favor of the United States. On appeal, however, the former Fifth Circuit reversed, holding that the soldier was acting within the scope of his employment. The panel explained that, under Alabama law, an employer may be liable for acts committed "in or about the business or duties assigned to him by his employer." *Id.* at 1254 (citing *Wells v. Henderson Land & Lumber Co.,* 200 Ala. 262, 76 So. 28, 29 (1917)). The court then reiterated that the soldier undertook the task of mowing the lawn pursuant to the command of base regulations and his superior officers:

> At the time of Child's injury, Soldier was performing a specific duty which had been assigned to him—to cut his portion of the lawn, was receiving a Governmental subsidy through his living quarters, was subject to military discipline, and was not on leave. Soldier's only choice was the immaterial one of which type of Government permitted mowing device he would use. Under Alabama law, once it is recognized that Soldier was performing a duty specifically assigned to him, the necessary conclusion is, and we hold as a matter of law, that Soldier was acting within the scope of his employment.

*Id.* at 1256.

The critical difference here is that, unlike the soldier in *Craft,* who was required by specific regulation to mow the lawn surrounding his quarters, Williams was *not* compelled in any sense to own or bring onto the base a private weapon. Williams made a voluntary decision to subject himself to the strictures of the regulation; his employer took no part in this choice. It is the absence of any specific requirement to perform the underlying act—the soldier's threshold decision to possess a handgun—that

distinguishes this case from *Craft.*[4]  More to the point, the absence of compulsion is powerful evidence that the Army did not think its purpose furthered by the soldier's possession of a private handgun.  The fact that Fort Gordon officials thought it advisable to promulgate certain regulations governing those soldiers who did choose to bring approved weapons onto the base does not convert a personal choice to bear a personal firearm while off-duty into an act designed to further the employer's business.[5]

Still another former Fifth Circuit case illustrates this principle in an analogous context.  In *Hinson v. United States,* an Army medical officer, while driving his personal automobile en route to his first duty assignment, collided with another automobile off the premises of the base, and injured that car's passengers.  The victims sued the United States under the FTCA. The district court granted the Government's motion for summary judgment, holding that the soldier was not acting within the scope of his employment at the time of the accident.  The Court of

---

[4]In a narrow sense, the soldier in *Craft* did have a measure of choice.  He was not required to accept the on-post living quarters assigned to him.  If he declined the offer, however, he would have forfeited the monthly housing allowance given to armed forces members residing in non-governmental housing.  542 F.2d at 1252.  In other words, the soldier "would have no on-base housing and no [allowance] for an off-base residence....  [T]his is truly a Hobson's choice." *Id*. at n. 5.  At Fort Gordon, by contrast, the Army did not offer privileges to those soldiers who brought privately-owned weapons on base.  Nor did it threaten to penalize those soldiers who declined to bring otherwise permissible weapons onto the base.  It is this kind of freedom of choice that separates *Craft* from the case at bar.

[5]This logic underscores our difficulty with the Ninth Circuit's analysis in *Lutz.*  Since no soldier was compelled to bring a dog or other animal onto the base, it is difficult to conceive how the regulation requiring pet owners to control their pets created duties within the soldier's "line of duty."

Appeals reached the opposite conclusion, and reversed. In so doing, the panel stressed that the soldier was executing an unequivocal order that commanded him to travel to the site of his first assignment. "He was not going to work," the court explained, "he was [instead] engaged in the performance of one of the very duties specifically assigned to him, receiving Army pay, subject to military discipline and not on leave. His only choice was the immaterial one of route and means of travel." *Id.* at 182. For these reasons, the court concluded that, under Georgia law, the soldier had acted within the scope of his employment. *Id.* at 183. In *Hinson,* as in *Craft,* the United States was exposed to respondeat superior liability precisely because the act giving rise to the alleged negligence had been undertaken not at the discretion of the soldier, but rather at the command of the military in order to further its purposes. *See also Hallberg v. Hilburn,* 434 F.2d 90, 92-93 (5th Cir.1970) (finding that soldier acted within the line of duty while traveling on the last leg of his journey to report to a new assignment, even though he had taken the previous several days off); *United States v. Culp,* 346 F.2d 35, 36 (5th Cir.1965) (per curiam) (following *Hinson* ).

## IV. Conclusion

The scope of employment doctrine, in Georgia as elsewhere, turns on whether the employee has acted to benefit his employer's purpose. Simply put, the existence of a base regulation implicated by a soldier's alleged negligence does not invariably transform an act otherwise outside the soldier's line of duty into one for which the United States may be deemed responsible under the FTCA. The

key inquiry remains whether the regulation imposes duties that directly and substantially serve the military's purpose. We conclude, therefore, that the district court properly held that Williams' conduct on the night of January 14, 1993 cannot be the basis for vicarious liability under Georgia's law of respondeat superior. Williams' activities on that evening were unrelated to any employment relationship with the military, and were not undertaken to further his employer's business. Since the district court did not err in rejecting the other theories that Bennett proffered in support of her claim, the decision below is

AFFIRMED.[6]

---

[6]Bennett's suggestion that the Army's failure to "properly enforce the regulations constitutes negligence" and is "at the very least, [a] question[ ] of fact for a jury," Appellant's Br. at 19-20, is unpersuasive. There is no evidence in the record tending to establish that the Government failed to enforce the registration requirement, let alone that it knew prior to the night of the shooting that Williams possessed an unregistered weapon. There is no evidence suggesting that the Government was negligent in its supervision of Risby's barracks on the night in question. And there is no evidence on which a reasonable jury could hold the Government vicariously liable for acts of Risby and Williams immediately after the shooting that inadvertently may have exacerbated Bennett's condition.

In her brief, Bennett argues that Williams' violation of regulation 210-13 constituted negligence *per se* under Georgia law. Since we find that the district court properly concluded that the United States cannot be held directly or vicariously liable to her under the FTCA, we need not address whether Williams' conduct was negligent within the meaning of the Act.