PATTERSON & WILDER CONSTRUCTION CO., INC., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 99-15301.

United States Court of Appeals,

Eleventh Circuit.

Sept. 15, 2000.

Appeal from the United States District Court for the Northern District of Alabama. (97-02840-CV-N-S), Edwin L. Nelson, Judge.

Before CARNES, MARCUS and FARRIS[*], Circuit Judges.

MARCUS, Circuit Judge:

In this appeal, we address the scope of the United States's potential liability under the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), for the alleged misconduct of private parties hired by federal agents to conduct covert law enforcement activities. Plaintiff Patterson & Wilder Construction Co., Inc. ("P&W") appeals the district court's order granting summary judgment in favor of Defendant United States of America ("Government") on the company's FTCA claim, which arises out of the destruction of a P&W-leased aircraft during a covert narcotics operation in Colombia. P&W asserts that the Government is responsible for the alleged misconduct of two private pilots who were hired by the Government to obtain the aircraft and carry out the mission because during the mission those pilots were acting as "employees" of the Government. The district court found that the Government did not supervise and control the pilots' activities during the critical phases of the operation and therefore the pilots could not be deemed employees. Because looking at the mission as a whole there is ample evidence that the Government supervised and controlled the pilots, a reasonable jury could conclude that the pilots were employees, and accordingly we vacate the summary judgment order.

I.

---

[*]Honorable Jerome Farris, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

The facts relevant to the single issue presented by this appeal are largely undisputed. P&W is a construction company headquartered in Pelham, Alabama. In 1992, a long-time P&W employee named Billy Latham co-founded Latham Aviation, Inc. to assume ownership of an aircraft formerly owned by him and used by P&W. In 1993, Stuart Boyd, a P&W employee who piloted the aircraft for the company, contacted fellow pilot and former co-worker Jason Reynolds to obtain information about a replacement aircraft. Reynolds located a Merlin Swearingin plane (the "Merlin") for sale and assisted in Latham Aviation's purchase of the plane. Later in 1993, P&W and Latham Aviation executed a lease agreement whereby Latham Aviation leased both the Merlin and its pilot, Boyd, to P&W for seven years.

In November 1994, a United States Customs Service agent named Daniel Dunn contacted Reynolds about working as a pilot to haul drugs from Colombia to the United States as part of a joint Customs-United States Drug Enforcement Administration ("DEA") undercover drug interdiction operation. Reynolds had worked extensively with Customs and other federal and non-federal agencies in similar covert operations since the early 1980's, having assisted Customs in 50-100 cases involving 200 defendants. Among other things, Reynolds worked as an undercover pilot, an aircraft broker, and as a drug buyer. Reynolds testified at deposition that his work for Customs was practically full-time at first, and on subsequent occasions his assignments would sometimes require two or three month commitments and in one instance required him to relocate to Texas for a year. Reynolds also testified that, in connection with his work for Customs, he had given a hundred depositions and appeared in court numerous times. Reynolds (under the assumed name "Jason Robards") executed documents with Customs that identified him as a "confidential source" and set certain guidelines for his conduct, but also indicated that he was not a Customs employee.

Dunn told Reynolds that the job would require Reynolds to locate a suitable aircraft, fly it to Colombia, purchase drugs in a pre-arranged transaction, and return to the United States. After speaking with Dunn, Reynolds contacted Boyd about the availability of the Merlin for the mission. The parties dispute who, if anyone, obtained authorization for using the aircraft; apparently both Reynolds and Boyd thought the other had obtained permission to use the plane. Also apparently disputed is what, if anything, Reynolds told the

Government about the ownership or leased status of the aircraft. Customs, for its part, apparently did not make any inquiry into the aircraft or Reynolds's or Boyd's authority to use it.

After receiving Reynolds's call, Boyd contacted an aircraft servicing company in Texas where the Merlin was undergoing a routine inspection, and indicated that Reynolds would shortly be picking up the aircraft. On November 8, 1994, Reynolds, d/b/a Wheels and Wings, Inc., received a cashier's check from Customs in the amount of $10,000 to pay for rental of the Merlin, operational expenses, insurance, and fuel for seven days. Subsequently, Reynolds received an additional $10,000 check to cover expenses. Under the arrangement with Customs and DEA, it was Reynolds's responsibility to locate and provide the aircraft and other equipment and supplies needed for the flight to Colombia.

On November 9, 1994, Reynolds and a Customs pilot traveled in a Customs aircraft to Tyler, Texas, to pick the Merlin up and fly it together to St. Petersburg, Florida, where it was kept overnight at a Customs facility. The next day, November 10, Reynolds flew the Merlin to Ft. Lauderdale, where the plane was towed by the Government to a Customs or DEA hangar where a "Mode-II" military transponder was installed. The transponder communicated via satellite with the Government, air traffic control centers, and AWAX surveillance planes identifying the Merlin as part of a United States Government operation. After the transponder was installed, Reynolds flew the plane back to St. Petersburg, where it was again stored overnight in a Customs hangar.

On November 11, Reynolds and another private pilot expected to participate in the mission met with DEA special agent Bob Quinn. Quinn instructed the pilots on the details of the mission. As Quinn explained, the pilots would fly to Howard Air Force Base in Panama where they would spend the night before flying to Colombia the next day. Upon arriving in Colombia, Reynolds was to land the plane at a particular grassy airstrip positioned in the jungle (to that end, Quinn provided Reynolds with the airstrip's coordinates as well as a radio frequency to use when contacting the Colombian drug dealer who was to meet the plane). At the airstrip, upon meeting the dealer, the pilots were to load the contraband and return to Panama. In the event anything went wrong, the pilots were to fly to Maracaibo, Venezuela, where DEA agents would be standing

by and would assist the pilots' safe return to the United States.

After hearing the details of the mission, the co-pilot decided against participating, at which time Reynolds suggested Boyd as a co-pilot since Boyd flew for the company that owned the plane. Quinn approved Reynolds's suggestion to contact Boyd, who agreed to make the trip after being told by Reynolds that he would probably make $100,000.

On November 13, Boyd arrived in Florida where he met with agents Dunn and Quinn. The agents advised Reynolds and Boyd that they were expected to make the trip the next day. According to Reynolds, the agents advised that if they did not go the next day, the deal would be off.

On the morning of November 14, as instructed, Reynolds and Boyd flew the Merlin to Marathon, Florida, where they refueled the plane, and then flew to Howard Air Force Base (an American base) in Panama. There, the aircraft's interior was reconfigured at the direction of the Government, and Reynolds and Boyd met once again with Customs and DEA agents, including an agent under Dunn's supervision named Willie Cancio. Cancio, another DEA agent, Reynolds and Boyd created the next day's flight plan. The plane was refueled, and Reynolds and Boyd spent the night in crew lodgings at the American base.

At 4:00 a.m. on November 15, Reynolds and Boyd departed Panama for Colombia, unaccompanied by federal agents. As the pilots approached the prescribed coordinates for the airstrip, they used the prescribed radio frequency to contact the drug dealer, Armando, but could not reach him. After the plane landed on the airstrip, Armando approached and indicated that he did not have the drugs but that they were nearby and that Reynolds and Boyd should fly to a second location. Rather than return to Maracaibo, Reynolds and Boyd joined by Armando flew to the second location, but decided not to land there when they saw Colombian policemen on horseback in the area. Instead, they flew back to the original airstrip where Armando told Reynolds and Boyd to wait with the plane while he went to get the drugs. After Armando left, the Colombian police discovered Reynolds and Boyd and arrested them as well as some of Armando's associates. Armando eventually secured the pilots' release with bribe money.

Meanwhile, in an attempt to confiscate the Merlin, the Colombian police unsuccessfully tried to fly

the plane out of the jungle. In so doing, the police crashed the plane shortly after take-off, destroying both props and engines. After Armando obtained Reynolds's and Boyd's release, his men returned to the location where the Merlin had crashed. Armando's men decided to burn the aircraft and bury the wreckage so that it would not alert other Colombian police who might be patrolling from the air. With the Merlin destroyed, and out of contact with federal agents, Reynolds and Boyd had no means to return to the United States. Instead, they stayed with Armando at his house in Colombia for eleven days, at which point Armando purchased commercial airline tickets for the pilots to return to Miami.

On January 8, 1996, Customs and DEA paid Reynolds and Boyd $270,000 for their services in the covert operation. By June 4, 1996, Reynolds and Boyd executed a settlement agreement with Latham Aviation whereby they paid Latham Aviation $240,000 to resolve all claims relating to the destruction of the aircraft. P&W was not a party to the settlement agreement.

Upon learning of the destruction of the Merlin, P&W ceased making lease payments to Latham Aviation and pursued an administrative claim with the United States Department of Treasury for property damage to its leasehold interest in the aircraft. Receiving no response to that claim, on August 19, 1997, P&W filed this lawsuit. In its complaint, P&W alleged that employees or agents of Customs or DEA had appropriated and exercised unauthorized control over an aircraft in which P&W had a leasehold interest without P&W's knowledge or permission. P&W sought damages of $129,047.53, representing the cost of securing a replacement aircraft. In its answer, the Government admitted that the plane was flown to Colombia and ultimately destroyed there, but denied that any employees of the Government exercised unauthorized control over the aircraft and specifically denied the allegation that the pilots, Reynolds and Boyd, were Government employees within the meaning of the FTCA.

After taking discovery, the Government filed a motion to dismiss or in the alternative for summary judgment, arguing that P&W's complaint should be dismissed for lack of subject matter jurisdiction or failure to state a claim. The motion raised multiple grounds for rejecting P&W's lawsuit, but concentrated on arguing that Reynolds and Boyd were not employees of the Government and therefore the Government could not be

held responsible for their alleged misconduct.

In an order and memorandum opinion dated October 7, 1999, the district court granted the Government's motion and dismissed P&W's complaint. Applying the standard adopted by this Court in *Means v. United States,* 176 F.3d 1376 (11th Cir.1999), the district court found that the Government did not exercise the kind of day-to-day supervision and control over the pilots' activities necessary for them to be deemed employees. The court observed that "federal officers had nothing to do with the acquisition of the Merlin aircraft for the undercover operation." Dist. Ct. Op. at 12. The court also observed that "during the flight, there was absolutely no federal supervision over Reynolds and Boyd who flew the plane by themselves without a federal agent on board." *Id.* at 12-13. The court addressed seven factors highlighted by P&W in support of the argument that Reynolds and Boyd could be deemed employees, but found all of those factors unpersuasive. Thus, the court concluded that "[b]ecause there is no genuine issue of material fact regarding whether Reynolds and Boyd were employees of the government, the government cannot be liable for their actions under the FTCA." *Id.* at 17. The court did not address the other grounds for dismissal argued by the Government. P&W subsequently filed a motion to alter, amend or vacate the judgment, which the district court denied on October 18, 1999. P&W then filed a timely notice of appeal.

II.

We give plenary review to a district court's grant of summary judgment. *See Burton v. City of Belle Glade,* 178 F.3d 1175, 1186-87 (11th Cir.), *reh'g denied,* 193 F.3d 525 (1999). Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict" for the non-moving party. *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Ala.,* 941 F.2d 1428, 1437 (11th Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2510, 2511-12, 91 L.Ed.2d 202 (1986)). As we have explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.*

*Burton,* 178 F.3d at 1187 (quoting *Clemons v. Dougherty County,* 684 F.2d 1365, 1368-69 (11th Cir.1982) (emphasis added) (citations omitted)). We review the district court's order in accordance with these standards.

### III.

The sole issue on appeal is whether the two pilots—Reynolds and Boyd—were "employees" of the Government within the meaning of the FTCA. The Government maintains that it did not possess sufficient control or supervision over the pilots' activities during the covert mission, as required by this Court's decision in *Means.* The Government particularly highlights the fact that it did not play any direct role in selecting the aircraft used for the operation, and also emphasizes that it did not even communicate with the pilots during the critical phase of the operation in Colombia that resulted in the destruction of the aircraft. P&W, on the other hand, contends that viewing the mission as a whole the Government retained authority to supervise and control Reynolds and Boyd, and that the pilots should therefore be classified as employees.

The FTCA operates as a limited waiver of the United States's sovereign immunity for "injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The alleged tortfeasor's status as an employee of the Government is essential to a finding of liability under the FTCA. *See Means,* 176 F.3d at 1379 (citing *Sheridan v. United States,* 487 U.S. 392, 400-01, 108 S.Ct. 2449, 2455, 101 L.Ed.2d 352 (1988)). The FTCA defines "employee of the Government" to include "officers or employees of any federal agency ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. As this definition makes clear, even private

individuals who are not on the Government's payroll may be considered employees for purposes of establishing the Government's liability under the statute.

To determine whether an individual is an employee of the Government, this Court in *Means* adopted the "control test." 176 F.3d at 1379. Under this test, a person is an employee of the Government if the Government controls and supervises the day-to-day activities of the alleged tortfeasor during the relevant time. *Id.* (citing *Logue v. United States,* 412 U.S. 521, 526-32, 93 S.Ct. 2215, 2218-2222, 37 L.Ed.2d 121 (1973)). Notably, it is not necessary that the Government continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of the task. *See Means,* 176 F.3d at 1380; *see also Logue,* 412 U.S. at 527-28, 93 S.Ct. at 2219 (the "critical factor" is "the authority of the principal to control the detailed physical performance of the" individual); *B&A Marine Co., Inc. v. American Foreign Shipping Co., Inc.,* 23 F.3d 709, 713 (2d Cir.1994) ("Courts have found it indicative of an agency relationship if the Government enjoys the power to control the detailed physical performance of the contractor, or if the Government in fact supervises the day-to-day operations." (citations and internal quotation marks omitted)).

The district court properly identified the controlling legal principles. We disagree, however, with that court's application of those principles to the facts of this case. Having reviewed the record extensively, we conclude that whether the alleged tortfeasors were "employees" of the Government within the meaning of the FTCA is an issue for trial and not one as to which summary judgment should have been granted.

There is powerful evidence upon which a reasonable factfinder, viewing the record in the light most favorable to P&W and drawing all inferences in P&W's favor, could determine that Reynolds, the pilot, and Boyd, the co-pilot, were temporary employees for purposes of this mission. Facts in this record demonstrate that the Government did not simply hire two contractors to accomplish a broadly-defined task while leaving to their discretion how the task was accomplished. Instead, the Government established how this entire operation would go down, and directed the pilots not only to achieve a particular result (purchasing narcotics from a Colombian drug dealer as part of a sting operation), but also to achieve that result in a particular way at a particular location at a particular time from a particular dealer. In other words, the Government treated

the pilots as employees, not independent contractors.

Undisputed facts demonstrate the extent of the Government's control and supervision over how Reynolds and Boyd carried out this mission. The Government (1) directed the pilots to fly in sequence to a specified location in St. Petersburg, then to and from a specified location in Ft. Lauderdale, then to a specified location in Panama, and only at that point to Colombia; (2) selected the exact location in Colombia where the deal was to occur, provided the pilots with the coordinates of that location, and instructed them to fly to that location; (3) made the arrangements for a particular drug dealer (Armando) to be at that location at a prescribed time; (4) determined the times at which the pilots were to leave from Florida for Panama and then from Panama to Colombia; (5) provided a radio frequency for the pilots to contact Armando, and instructed the pilots to use that frequency, and installed a transponder on the plane so its movements could be tracked and so that it could be identified as part of a U.S. Government operation; (6) instructed the pilots to attend meetings with its agents; (7) instructed the pilots to modify the aircraft's interior while the aircraft was on the ground at the American base in Panama; (8) participated in preparing the flight plan for the Panama-Colombia leg; (9) at least nominally supervised the personal activities of the pilots as they spent the night at crew lodgings in Panama before flying to Colombia; and (10) clearly instructed the pilots as to what they were expected to do when they arrived in Colombia (meet Armando, load the contraband and return to Panama).

The record may fairly be read to show the Government decided, and instructed the pilots on, virtually every important aspect of the aircraft's intended use. This was clearly not an operation where the pilots were given an objective and left to achieve that objective however they saw fit—the Government actively supervised and dictated many if not most of the significant day-to-day activities of the mission up to the point when events went awry on the ground. Moreover, the Government not only dictated the pilots' activities, but arranged what would occur on the ground in Colombia, thereby controlling both ends of the mission. Presented with this kind of evidence of the Government's involvement in the major as well as minor details of how the mission went down, a reasonable factfinder could well conclude that the Government exercised

enough control over the pilots' day-to-day activities to make the pilots employees.[1]

Moreover, a factfinder could downplay the significance of the evidence tending to support the district court's conclusion that the pilots were not employees. It is true that the Government did not directly supervise or control the activities of the pilots in the air once the plane left for Colombia. However, the pilots had already been instructed extensively as to where they were to proceed, who they were to meet, and what they were supposed to do; *none* of those core issues were left to the pilots' discretion. The fact that the pilots had the discretion to fly the airplane as they saw fit may carry little weight because, in the context of this mission, the actual flying of the plane could reasonably be viewed as a ministerial task that did not require any particularly unique skills on the part of the pilots.[2] Other facts tending to illustrate the pilots' discretion with respect to the mechanics of flying the aircraft (such as Reynolds's selecting Boyd as co-pilot and purchasing needed provisions with the money advanced up front by Customs) likewise could be downplayed by a jury, especially because some of these decisions appear to have been subject to at least the tacit approval of the Government.

The fact that the pilots were unsupervised after they landed in Colombia, and seemingly deviated from the Government's instructions by not flying to Maracaibo upon learning from Armando that the drugs were not at the prescribed location, may carry greater weight.[3] But this phase of the operation cannot be

---

[1]This direct evidence of supervision and control may be viewed against the backdrop of other relevant facts. Among other things, the Government directly supervised the airplane while it was hangared in Florida and Panama. It devised and proposed this mission and specifically sought out Reynolds to perform the operation. Finally, Reynolds and Boyd were not volunteers; on the contrary, they were promised a significant sum of money by the Government to perform this mission in accordance with the Government's specifications.

[2]*Cf. United States v. Becker,* 378 F.2d 319, 322-23 (9th Cir.1967) (pilot flying reconnaissance flights for Forest Service deemed employee even though he flew alone because the Government told him " 'when and where to go and what to do' "); *Motors Ins. Corp. v. Aviation Specialties, Inc.,* 304 F.Supp. 973, 977 (W.D.Mich.1969) (finding that aerial spraying company hired by the Government to conduct crop spraying operations was an employee because "the degree of control of the details of the performance of the contract ... left only the actual flying of the aircraft in the hands of" the company).

[3]On the other hand, a factfinder might well infer that the Government's failure to supervise or control the pilots' activities on the ground was dictated not by a desire to leave that aspect of the operation entirely to the judgment and discretion of the pilots, but rather by practical limitations on communicating with informants conducting a covert operation in a foreign county. *Cf. Ezekiel v. Michel,* 66 F.3d 894,

viewed in isolation; it is essential to consider the *entire* relationship between the parties with respect to the project at hand. Courts applying the common law of agency in other contexts have made this point expressly regarding the control test, and it seems to us a logical one. *See Birchem v. Knights of Columbus,* 116 F.3d 310, 312 (8th Cir.1997) ("In applying the common law of agency test, the Supreme Court looks at a large number of factors that define the parties' *total contractual relationship* " (emphasis added)) (citing *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-53, 109 S.Ct. 2166, 2178-80, 104 L.Ed.2d 811 (1989)); *Wilde v. County of Kandiyohi,* 15 F.3d 103, 105 (8th Cir.1994) ("To decide whether a person is an employee or independent contractor under the common law of agency, the *totality of the working relationship* is examined." (emphasis added)); *ARA Leisure Servs., Inc. v. NLRB,* 782 F.2d 456, 460 (4th Cir.1986) (under control test, "we must examine *the relationship in its entirety,* considering all the circumstances that suggest either employee or independent contractor status" (emphasis added)); *Merchants Home Deliv. Serv., Inc. v. NLRB,* 580 F.2d 966, 973 (9th Cir.1978) (" 'Of the considerations employed in reaching a decision under general agency law [as to whether a person is an employee], the determination of who has the right to control and direct the work is foremost ... tempered, however, by other considerations relevant to the *relationship in its entirety.*' " (emphasis added) (citation omitted)).[4]

902 (7th Cir.1995) (explaining that a strict application of the "control" test is inappropriate with respect to physicians alleged to be Government employees because physicians are obliged to exercise independent judgment regarding the treatment of patients and therefore could rarely if ever be deemed employees under the control test). In all likelihood the Government would have handled one of its full-time employees just as it did Reynolds and Boyd if such an employee was asked to carry out this kind of covert mission. Moreover, the pilots' activities on the ground in Colombia were not so far removed from their responsibilities and instructions to constitute the kind of "frolic" that would have taken them outside the scope of their employment. *See, e.g., Bennett v. United States,* 102 F.3d 486, 494 (11th Cir.1996) (holding in FTCA case that touchstone of the "scope of employment" inquiry is whether the employee was acting for the purpose of benefitting the employer).

[4]The crux of the dissent appears to be a concern that the Government had no direct supervision and control over the process of acquiring and destroying the plane. But it is an improper application of the control test to focus merely on two discrete pieces of the parties' relationship while overlooking other aspects of the relationship that may clearly and compellingly evince the Government's supervision and control. As these cases establish, we are required to look at the totality of the parties' relationship over the six days of the mission rather than only at isolated phases. Although the Government's control may have been more peripheral during the transactions whereby the plane was acquired and destroyed, the Government's control was virtually complete at all other important stages of the mission. In short, we do not believe that it is proper legally or factually to focus exclusively on the Government's relative lack of

Evidence that the pilots' day-to-day activities at this discrete stage of the mission were not under the direct supervision of the Government must be viewed against the backdrop of the substantial evidence that their activities were closely supervised and controlled at most other critical stages of the mission.[5] For similar reasons a factfinder might also downplay evidence that the Government was not deeply involved in the process of obtaining the Merlin. Acquiring a suitable aircraft was simply one of Reynolds's and Boyd's many responsibilities during this complex, dangerous mission.

We also disagree with the view of the district court and the Government that this case is controlled by the holding in *Means*. *Means* arose out of a joint investigation by the FBI and Jefferson County, Alabama law enforcement officers into narcotics and weapons offenses. The FBI planned to execute arrest and search warrants, but not until county officers had entered and secured the premises. Federal agents briefed county officers the day before the operation, but the county SWAT team, under the leadership of a county deputy sheriff, "had discretion regarding the entry and security of the premises," including with regard to the amount of force used. 176 F.3d at 1378. When they entered the residence, county officers used a flash bang device and in the process injured the plaintiff, who sued under the FTCA. The district court granted summary judgment in favor of the Government because the county officers who allegedly committed the tortious acts were not Government employees. Affirming, we emphasized that "[t]he SWAT team and the county deputy sheriff commanding the team made all tactical decisions as to the best method of entering the house and the appropriate amount of force to use to secure the premises. While federal agents provided background information ... they did not participate in the raid." *Id.* at 1379.

---

control during two discrete phases of the mission. Looking at the relationship as a whole, as we must, a reasonable jury *could* find sufficient control for the pilots to be deemed employees.

[5]Other notable evidence tending to show that the pilots were not employees includes the fact that they were not full-time Government officials, were paid in lump-sum fashion rather than based on an hourly wage, and represented in some documents that they were not Customs employees. But method of payment is, at best, only one consideration in determining whether a person is an employee within the meaning of the FTCA. *Cf. Linkous v. United States,* 142 F.3d 271, 275-76 (5th Cir.1998) (identifying method of payment as one of multiple factors from the Restatement of Torts used to distinguish an employee from an independent contractor). The same is true for the parties' subjective expectations as to how their relationship is described. *See id.*

*Means* is readily distinguishable from this case. There, although federal agents briefed local officers before the operation in question, they did not set plans for the local officers' primary task (entering and securing the house), and instead left that task almost entirely to the officers' planning and discretion. Moreover, here the Government's involvement in the mission (and interaction with the pilots) went significantly beyond merely briefing the pilots or supplying them with background information. In addition, the local officers in *Means* were not to receive any direct payment from the United States, and were performing duties within the ambit of their normal responsibilities as local law enforcement employees involved in a joint investigation. *Means,* in short, does not answer the question before us.

The Ninth Circuit's decision in *Slagle v. United States,* 612 F.2d 1157 (9th Cir.1980), also highlighted by the district court and the Government, is likewise distinguishable and is not binding precedent. In *Slagle,* the Ninth Circuit found that a drug informant whose conduct allegedly caused injury to the plaintiff was not an employee within the meaning of the FTCA. The court opined, without support, that "in general the activities of an informant are not subject to the actual control or right of control of a federal agent." *Id.* at 1161. It then emphasized that not only did the informant's agreement expressly give him the discretion to arrange his meetings and conduct his activities as he saw fit, the informant actually violated the few guidelines he did have by carrying a gun. *Id.* In sharp contrast to this case, in *Slagle* the Government did not dictate the where, why, and how of the informant's mission; indeed, the Government was not even aware that the informant was undertaking the mission in question. The informant had substantial discretion over his activities and the meetings he arranged, subject only to broad guidelines set by the Government.[6] At all

---

[6]The Ninth Circuit expressly distinguished *Slagle* in *Leaf v. United States,* 661 F.2d 740 (9th Cir.1981), where it upheld the district court's finding that a pilot who volunteered to participate in a drug smuggling operation on behalf of the Government, and crashed an airplane in the course of that operation, was an employee for purposes of FTCA liability. The court noted that the pilot (1) volunteered his services to the Government; (2) used his contacts to learn of the smuggling operation; (3) made all of the arrangements relating to the selection and use of an aircraft in that operation; and (4) flew the plane himself. The Ninth Circuit explained that these activities were undertaken with the "knowledge and approval of the DEA agents assigned to supervise him." *Id.* at 741. The court described *Slagle* as arising in a "significantly different factual setting[ ]." *Id.*

The dissent proposes that still another Ninth Circuit decision, *Letnes v. United States,* 820 F.2d 1517 (9th Cir.1987), provides the proper analogy for this case. *Letnes* is not binding

events, this Circuit's precedent does not dictate that the Government is entitled to judgment as a matter of law on the facts of the case at bar.

We do not mean to rule that the pilots unquestionably qualify as employees of the Government; the Government's supervision and control was more peripheral during the specific transactions that lie at the heart of P&W's case (Reynolds's acquisition of the Merlin for use in the mission, and the destruction of the plane in the Colombian jungle). Nevertheless, viewing the relationship *in its totality,* P&W has come forward with enough evidence for a reasonable factfinder to conclude that Reynolds and Boyd—having been retained not just to perform a particular task, but to perform it in a particular way at a particular location at a particular time in accordance with the Government's precise instructions—were sufficiently under the Government's control to be deemed employees.[7] Accordingly, we vacate the district court's order granting summary judgment, and remand for further proceedings consistent with this opinion.[8]

_____

precedent, however, and notably was not cited by either of the parties or by the district court in its opinion. Moreover, we think *Letnes* is inapposite. That case addressed whether a pilot hired for general firefighting duties qualified as a Government employee by virtue of the fact that he was subject to Government safety regulations. Among many differences between this case and *Letnes,* here the Government controlled the strategy and purpose of the pilots' mission, rather than simply subjecting the pilots to a few safety regulations of general application. The dissent also contends that *Letnes* is more current Ninth Circuit precedent than *Slagle* or *Becker.* We discuss those non-Eleventh Circuit cases, however, only because (unlike *Letnes* ) they were relied on heavily by the district court in its opinion and by the parties in their briefs on appeal. Simply put, our decision does not turn on these or any other Ninth Circuit decisions.

[7]Our holding that the Government exercised sufficient control over Reynolds and Boyd for a factfinder to deem them employees under the control test conforms to reasonable expectations. When private parties participate in law enforcement operations, it would seem that their activities should, if anything, be monitored more closely than regular, highly trained law enforcement personnel. The irony would be considerable if the Government, simply out of a desire to insulate itself from liability, exercised less control over private parties involved in sensitive law enforcement operations.

[8]During oral argument, P&W emphasized an additional reason for reversing the summary judgment order. According to P&W, the district court failed to consider P&W's theory that regardless of the status of Reynolds and Boyd as employees, a reasonable jury could still find the Government liable based on the misconduct of persons who unquestionably are its employees (e.g., agent Dunn). This theory, although noted in passing in P&W's brief before this Court, was not clearly stated to the district court in P&W's opposition to the Government's motion for summary judgment and consequently was not considered by that court. We therefore decline to address that theory at this time. We also decline to address now the alternative grounds for summary judgment which were argued by the Government in its motion but were not ruled upon by the district court and were not set forth in the Government's brief on appeal.

VACATED AND REMANDED.

FARRIS, Circuit Judge, dissenting:

The majority begins the opening paragraph of its discussion of the merits with a sentence that I adopt to begin my brief dissent: "The facts relevant to the single issue presented by this appeal are largely undisputed." Because I am convinced that the trial court reviewed those undisputed facts and properly entered summary judgment for the government, I would affirm.

I agree with the majority that the sole issue on appeal is "whether the two pilots—Reynolds and Boyd—were 'employees' of the Government within the meaning of the FTCA." We part ways, however, on the answer to that question.

As a limited waiver of sovereign immunity, the FTCA is strictly construed, and all ambiguities are resolved in favor of the Government. *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). Against this backdrop of limited abrogation of sovereign immunity, this court has adopted the "control test" to determine whether a defendant was acting as an employee of the Government thereby exposing the government to liability under the FTCA. *See Means v. United States,* 176 F.3d 1376, 1378 (11th Cir.1999). Under the control test an individual is an employee of the Government for FTCA purposes where the Government controls and supervises the day-to-day activities of the person. *See Means,* 176 F.3d at 1379 (citing *Logue v. United States,* 412 U.S. 521, 526-32, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973)).

Applying the control test to the mission as a whole, the majority concludes that there is "powerful evidence" upon which a reasonable factfinder could determine the pilots were employees of the Government. I disagree. The facts are not in dispute. There is nothing for a trier of fact to resolve. Conclusions from those facts were properly ruled upon by the district court as a matter of law.

In applying the control test, the majority analyzes the relationship between the Government and the pilots "*in its totality.*" The majority's litany of examples where the pilots interacted with Government officials during the pre-flight preparations are not disputed. The majority places heightened significance on facts such

as the Government's directions on how the pilots should proceed from Texas to Colombia, designation of a specific locale in Colombia, supervision of the plane while it was hangared overnight, instructions on meeting a specific drug dealer, installation of a transponder, and various other pre-mission arrangements. If there were any factual dispute, or any disputed inferences from those facts, I would agree with the majority.

The essence of P&W's claim under the FTCA is that the pilots took, flew and lost the aircraft, in which P&W possessed an interest as a lessee with an option to buy, without P&W's consent. P&W now wants compensation for the loss. While understandable and sympathetic, the claim is misdirected. P&W's claim stems from two specific transactions: (1) Reynolds's allegedly unauthorized acquisition of the plane and (2) the pilots' subsequent loss of the plane in the Colombian jungle. The undisputed evidence is that the Government had no involvement, let alone control or supervision, in acquiring or destroying the plane. The majority recognizes that the Government's role in these transactions was "peripheral" at most.

After acknowledging that these two transactions "lie at the heart" of P&W's case, the majority emphasizes the Government's assistance in the pre-flight preparations. The Government did tell the pilots where to fly (i.e. Florida, Panama, and Colombia) but that alone, or in conjunction with other undisputed facts, does not resolve the question. *See Letnes v. United States,* 820 F.2d 1517, 1518 (9th Cir.1987); *see also Curry v. United States,* 97 F.3d 412, 415 (10th Cir.1996) (recognizing that detailed regulations and inspections are not in and of themselves evidence of an employer-employee relationship).

In *Letnes,* the Ninth Circuit explained that the Government's ability to tell a pilot where and when to drop fire retardant was insufficient to indicate supervision over the physical details of the pilot's daily operations. *See Letnes,* 820 F.2d at 1519. Despite restrictive contract provisions governing the operation, maintenance, and equipment of the plane, the Ninth Circuit determined that the government did not control the "detailed physical operation of the plane" because such provisions were aimed at securing a minimum level of safety. *Id.*

Although not binding precedent in this circuit, *Letnes* provides a more current and analogous application of the control test than the majority's discussion of *Becker* or *Slagle*. Although the Government

did provide instructions as to where and when the pilots were to meet Armando, such assistance does not evidence Government control over the pilots' daily operation. *See Letnes,* 820 F.2d at 1519. Similarly, I would not conclude that the Government's installation of a transponder and other alterations to the aircraft equates to control over the physical operation of the plane. These modifications were necessary to secure minimum safety. *See id.*

I agree with the district court that the record presented on the motion for summary judgment justified its ruling, as a matter of law, that the pilots were not acting as employees of the Government. The majority wisely, in my view, refuses to direct entry of judgment for P&W.

I recognize that inferences to be drawn from undisputed facts may present a jury question if reasonable minds may differ regarding those inferences. Here, on the pivotal questions, there are no conflicting inferences.

I would affirm.