**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2070

U.S. TOBACCO COOPERATIVE INC.; U.S. FLUE-CURED TOBACCO
GROWERS, INC.; BIG SOUTH DISTRIBUTION, LLC,

Plaintiffs – Appellees,

and

UNITED STATES OF AMERICA,

Intervenor – Appellee,

v.

BIG SOUTH WHOLESALE OF VIRGINIA, LLC, d/b/a Big Sky International;
BIG SOUTH WHOLESALE, LLC; JASON CARPENTER; CHRISTOPHER
SMALL,

Defendants – Appellants,

and

UNIVERSAL SERVICES FIRST CONSULTING, a/k/a Universal Services
Consulting Group; EMORY STEPHEN DANIEL; ALBERT M. JOHNSON,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Terrence W. Boyle, District Judge.  (5:13-cv-00527-BO)

Argued:  May 9, 2018                           Decided:  August 3, 2018

Before TRAXLER, AGEE, and WYNN, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Traxler wrote the opinion, in which Judge Agee and Judge Wynn joined.

_____

**ARGUED:** Gary S. Parsons, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellants. Patrick George Nemeroff, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States. Richard P. Bress, LATHAM & WATKINS LLP, Washington, D.C., for Appellees U.S. Tobacco Cooperative Inc., U.S. Flue-Cured Tobacco Growers, Inc., and Big South Distribution, LLC. **ON BRIEF:** Julia C. Ambrose, W. Michael Dowling, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina; Alan D. Mathis, BUTLER SNOW, LLP, Birmingham, Alabama, for Appellants. A. Tevis Marshall, Richmond, Virginia, Kimberly J. Lehman, OGLETREE DEAKINS NASH SMOAK & STEWART, PC, Raleigh, North Carolina; Kathryn H. Ruemmler, Elana Nightingale Dawson, Genevieve P. Hoffman, LATHAM & WATKINS LLP, Washington, D.C., for Appellees U.S. Tobacco Cooperative Inc., U.S. Flue-Cured Tobacco Growers, Inc., and Big South Distribution, LLC. Chad A. Readler, Acting Assistant Attorney General, Jessie K. Liu, United States Attorney, Mark B. Stern, Patrick G. Nemeroff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States.

_____

TRAXLER, Circuit Judge:

Defendants Jason Carpenter, Christopher Small, Big South Wholesale, LLC, and Big South Wholesale of Virginia, LLC, d/b/a Big Sky International, appeal the district judge's order granting a motion to reconsider a predecessor district judge's order which had granted Defendants' petition to substitute the United States as a party defendant under the Westfall Act. *See* 28 U.S.C. § 2679(b). The Westfall Act provides "federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). We hold that the district judge abused his discretion in granting the motion to reconsider. Therefore, we vacate the district court's order granting reconsideration under Rule 54(b) and remand with instructions to reinstate the prior order granting Defendants' petition to substitute.

I.

The Plaintiffs in this action are a tobacco growers cooperative, its manufacturing arm, and its distribution arm. Plaintiff U.S. Tobacco Cooperative, Inc. ("USTC") "is a cooperative of flue-cured tobacco growers which processes and markets its members' tobacco to domestic and international customers." J.A. 452-53. Plaintiff U.S. Flue-Cured Tobacco Growers Inc. ("USFC") "manufactures cigarettes and other tobacco products." J.A. 453. It is a wholly owned subsidiary of USTC and shares the same Board of Directors.

Defendants Carpenter and Small have been established businessmen in the wholesale tobacco distribution business for many years. They operated two wholesale

3

tobacco distribution companies—Defendants Big South Wholesale, LLC ("BSW") and Big South Wholesale of Virginia, LLC ("BSV"). As discussed in more detail below, in early 2011, USFC negotiated the purchase of BSW's and BSV's assets, and formed Plaintiff Big South Distribution, LLC ("BSD") to close the purchase and thereafter act as the distribution arm for Plaintiffs. This lawsuit arises out of that contract to purchase and the actions taken by Carpenter and Small thereafter as a consultant and employee, respectively, for BSD, while simultaneously operating as confidential informants for the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

A.

Prior to the events at issue in this lawsuit, the ATF was investigating numerous complex tobacco-trafficking cases and the illicit tobacco trade. Among other things, such tobacco trafficking served "as a means of funding organized crime." J.A. 617. However, due to the "close-knit subculture of groups and individuals who operated in the same circles and, often times, employed the same fraud schemes," the ATF realized that "it was impossible to simply appear on scene as a new distributor or buyer, as ATF's initial efforts attempted to do. The subculture was too wise and the effort failed." J.A. 618. It needed the help of an established tobacco distributor to gain the trust of tobacco industry participants. Defendant Carpenter fit the bill, and he agreed to help.

"Over time, Carpenter's cooperation became significant and on November 9, 2006, he agreed to become a documented ATF confidential informant." J.A. 617. In connection with his duties, Carpenter signed an "Informant Agreement," in which he agreed to "[m]ake controlled purchases of evidence, wear a transmitter/recorder, provide

4

testimony in Grand Jury, testify in court, and [render] other assistance as required." J.A. 437. The agreement provided that he would "be working closely with ATF for purposes of th[e] investigation," but that he was "not a law enforcement officer, an employee, or agent of ATF" and would "not hold [himself] out to be such." J.A. 437. ATF was required to "reimburse [Carpenter] for expenses incurred that [were] deemed by ATF to be reasonable and in furtherance of th[e] investigation," and Carpenter "underst[ood] that any monetary or other type of reward given to [him] by ATF, either for services rendered or information provided, must be declared as other income on any income tax return [that he] may be required to file." J.A. 437. Defendant Small "was eventually provided knowledge of the [undercover] ATF operation" as well, and he became a cooperating witness for ATF. J.A. 617.[1] Although there were a number of ATF offices and ATF agents involved in the undercover operation with Carpenter and Small, their primary ATF handler was Senior Special Agent Thomas Lesnak.

Over the next several years, Carpenter and Small worked with ATF and several other federal law enforcement agencies. Unlike many confidential or undercover informants, Carpenter and Small at all times worked voluntarily and as result of their status in the tobacco industry. They were never under threat of criminal prosecution. The undercover operations were conducted under the legitimate cloak of BSW/BSV,

---

[1] The only practical difference between a confidential informant and a cooperating witness appears to be that a confidential informant agrees to wear a recording device. Carpenter was willing to and did record targets. Small did not and, therefore, did not sign an Informant Agreement. However, the two men operated as a team and were jointly involved in the tobacco trafficking investigations. Plaintiffs agree that, for purposes of this appeal, we may consider both men to be confidential informants for the ATF.

5

which served "as somewhat of a 'Trojan Horse.'" J.A. 618. "Th[e] operation, and the others that followed, targeted corrupt cigarette retailers, wholesalers, brokers, distributors and manufacturers. Some of the targets were very specific in nature while others were unknown until they proposed corrupt deals to Carpenter, other [confidential informants], or ATF undercover [special agents] acting as employees of Carpenter's company." J.A. 617. Both Carpenter and Small "placed themselves in precarious, as well as dangerous situations, in support of ATF and other federal agency investigations." J.A. 617.

During the ATF investigations, proceeds from the tobacco sales were deposited in one of two different accounts—a "churning account" or a "management account." Churning accounts are seeded with funds appropriated by Congress "up front to purchase cigarettes and then sell them to targets for a markup." J.A. 618. "Additionally, some cigarettes used in these transactions . . . may have been transacted in furtherance of another violation of federal law, such as mail/wire fraud, structuring, or even traded for controlled substances or firearms." J.A. 618. "In a typical churning operation involving the investigation of contraband cigarette trafficking activity," the proceeds were "deposited into an undercover bank account"—the churning account—"and re-invested into the operation as a means to fund the investigation." J.A. 618. The ATF "churning investigations utilizing Carpenter and Small were duly authorized and closely monitored by case agents and ATF Headquarters. Additionally, these same investigations have been audited several times by ATF and the Department of Justice Office of the Inspector General." J.A. 619.

6

Management accounts were used to hold funds that were generated from sales to non-targets. Carpenter's and Small's "undercover roles required them to sell tobacco products in four distinct scenarios." J.A. 449. In addition to sales of tobacco products to the "known investigative targets" (which generated the "churning income"), they sold tobacco products to (1) persons "suspected of engaging in illegal cigarette trafficking prior to designation of those suspects as investigative targets;" (2) "persons other than investigative targets in transactions in which the government set the price, for purposes of establishing and maintaining the undercover role;" and (3) "legitimate customers in non-government directed transactions." J.A. 449.

"ATF Headquarters officials, including the Program Office responsible for tobacco investigations, and the Deputy Assistant Director (Field Operations-East) with oversight responsibility for the Washington Field Division ("WFD"), were aware of the [management] accounts." J.A. 449. "The WFD and Special Agent Lesnak initially established and utilized the management accounts" following "verbal directives from the ATF Program Office and other Headquarters officials [which] flowed from an opinion [the] ATF Chief Counsel provided in approximately 2009 that no funds other than churning proceeds could be deposited into [a] 'churning bank account.'" J.A. 449. "This was done for several reasons, including operational security, and to limit ATF's involvement with the legitimate business activities of the cooperating individuals. Although [the management] accounts were under the control of Carpenter and Small, the case agent, [Special Agent] Lesnak, periodically monitored the accounts." J.A. 450. In addition, "WFD personnel, including [Special Agent Lesnak] and [the ATF Assistant

7

Director] periodically briefed ATF Headquarters personnel on the investigations at issue in this litigation, including the usage of the management accounts." J.A. 450.

During the ongoing ATF investigations, these management account funds were used to fund other undercover investigations for a myriad of federal law enforcement agencies—a practice referred to as "backstopping." Backstopping allows undercover agents to conceal their identities and undercover activities. For example, backstopping may include providing vehicles and leasing property for use by undercover agents, procuring insurance on vehicles and buildings, funding travel for undercover agents, providing credit cards for undercover agents to cover their expenses, and purchasing product from targets and non-targets. At the conclusion of an operation, ATF would reconcile the funds that had been deposited into the management accounts. Expenses that Carpenter and Small had advanced to or incurred on behalf of law enforcement and proceeds from sales that were determined to be wholly legitimate (after accounting for any ATF-authorized interim distributions to Carpenter and Small) remained in the accounts and the balance of the funds—from target and non-target transactions that were determined to be illicit—were forfeited to the government.

B.

Around December 2010, Carpenter and Small decided to sell the assets of BSW and BSV, but planned to continue their undercover work for the ATF. The Vice President of USFC at the time, Stephen Daniel, approached Carpenter and Small about buying the assets in order to expand USTC and USFC into the tobacco wholesale market, and an Asset Purchase Agreement ("APA") was negotiated. Plaintiff BSD was formed as

8

a wholly owned subsidiary of USFC to acquire the assets and inventory of BSW/BSV and thereafter operate the tobacco distribution arm for USTC and USFC. The managers of BSD were USTC and USFC board members. Under the arrangement, BSD would also acquire the name "Big South" and all goodwill associated with the name. As a result of their expertise and experience, Small would be hired to be BSD's executive director, and Carpenter would act as a BSD consultant. Carpenter's and Small's consulting and employment agreements would contain non-compete covenants which prohibited them from engaging in the wholesale acquisition and distribution of tobacco products in Alabama, North Carolina, Virginia, Tennessee, South Carolina, and Georgia.

ATF agents were aware of the APA at the time, but made it clear to Carpenter and Small that ATF's undercover activities would remain exclusively with them. Also, the BSW/BSV assets included tobacco products that had been purchased in connection with Carpenter's and Small's undercover work for the ATF. Special Agent Lesnak dictated the purchase price for ATF's share of the BSW/BSV assets.

On March 23, 2011, ATF Special Agent Dan Whittemore, along with Carpenter and Small, held a confidential meeting with representatives of USFC and USTC to discuss the APA and Carpenter's and Small's ongoing activities on behalf of federal law enforcement. Plaintiffs' representatives included USFC Vice President Daniel and Albert Johnson, who was then the Chairman of the Board of USTC/USFC. The specifics of the meeting, including the information that Agent Whittemore shared with Plaintiffs' representatives about the scope of Carpenter's and Small's future undercover activities, are the subject of some factual dispute. However, Agent Whittemore at a minimum

9

advised Plaintiffs' representatives at that meeting that Carpenter and Small were confidential ATF informants, that their law enforcement activities on behalf of the ATF would continue after the sale of the assets, and that their undercover activities placed them at great personal risk which necessitated confidentiality. After some back and forth as to how to deal with Carpenter's and Small's post-sale undercover activities, USFC's legal counsel proposed that "we all recognize that the 'special' activities will not violate the non-compete, but not document that fact, for obvious reasons." J.A. 1128. Carpenter and Small accepted the proposal and the APA was signed on May 1, 2011. Carpenter and Small also signed their consulting and employment agreements.

Upon the close of the APA, Stephen Daniel became President of BSD. BSD operated its tobacco wholesale business from the same warehouse in Bristol, Virginia that had housed the BSW/BSV tobacco assets, and Carpenter and Small assumed their duties with BSD. Carpenter and Small also continued their work on behalf of ATF, but did so using the name "Big Sky International" ("Big Sky"), which had been set up as a d/b/a entity of BSV with the approval of BSD President Daniel—provided that they not use the name "Big South."

Thereafter, Carpenter and Small continued their ATF undercover investigations under the legitimate cloak of Big Sky, buying and selling tobacco products purchased with government funds to known investigative targets and suspects, and to persons other than investigative targets for the purpose of maintaining the legitimacy of the business and moving the inventory. Special Agent Lesnak testified that he was at the Bristol warehouse virtually every day and that it was his understanding that 100 percent of the

10

operations of Big Sky after the APA was executed was related to the law enforcement operations. As before, the proceeds from the Big Sky transactions were deposited into either a churning account or management account, based upon the nature of the transaction. Non-churning monies were deposited into management accounts, used to continue to fund backstopping activities for law enforcement agencies, and were ultimately reviewed and reconciled by ATF. Carpenter and Small were allowed to keep a per-carton share of the profit from the operation as monetary compensation for their law enforcement activities, and the remaining account balance was transferred to ATF's forfeiture fund.

Prior to and after the APA, Carpenter and Small also made a number of monetary payments to Daniel and/or his private company, Universal Services First Consulting a/k/a Universal Services Consulting Group ("Universal"). Carpenter and Small testified that these payments were for Daniel's assistance with IRS matters that required specialized knowledge of the undercover operations and expertise in accounting. Agent Lesnak, who at times interacted with Daniel in connection with his work at the warehouse, "asked if Mr. Carpenter and Mr. Small were paying Mr. Daniel for the work that he was doing . . . to help Small and Carpenter with an IRS audit, as well as his activities with law enforcement," and was assured that he was being paid. J.A. 450. Although ATF did not make direct payments to Daniel, or direct Carpenter and Small to do so, ATF acknowledges that Agent Lesnak was aware of the payments.

No one disputes the extent and value of Carpenter's and Small's undercover activities over this seven-year period to ATF and to numerous other international, federal

11

and state agencies, or the dangers that the two men subjected themselves and their families to when they conducted these ongoing investigations. ATF Supervisory Special Agent Ryan S. Kaye (who was assigned to the Bristol Field Office until 2008, and thereafter assigned as a Branch Chief to ATF's Operations Division) summarized these activities as follows:

> Over the course of several years, Carpenter and Small interacted with dozens of targets of criminal investigations. Carpenter's and Small's cooperation was integral to the prosecution of over 100 criminal defendants and forfeiture of tens of millions of dollars. At the same time, both men came to know the identities of other cooperating individuals, many of whom were cooperating for different reasons. Both men came to know targets of highly sensitive investigations, as well as the identities of [undercover] officers and [Special Agents]. Carpenter and Small traveled extensively, both domestically and abroad, to support law enforcement operations. In several instances, both Carpenter and Small were in the same room with friends and business associates, knowing full well they were the target of an investigation. In some instances, these targets were providing to Carpenter and Small information that would eventually help to put them in prison.
>
> Carpenter's and Small's knowledge of previous and ongoing investigations, informants and [undercover] personnel can be described as vast. While many of the investigations supported by Carpenter and Small targeted white-collar frauds with no history of violent crime, a small but significant group of targets have violent criminal histories, are members of domestic and/or international organized criminal groups, or have ties to corrupt political figures overseas.

J.A. 619. Other ATF witnesses confirmed the same, including ATF Special Agent William C. Duke who offered his "official recognition that Christopher Small and Jason Carpenter acted in a covert yet official capacity to assist the Government . . . in numerous investigations/operations within the Washington Field division and across the country." J.A. 158.

12

C.

On July 23, 2013, Plaintiffs filed this lawsuit against Carpenter, Small, BSW, and BSV d/b/a Big Sky, former USFC Vice President (and BSD President) Steven Daniel, his company Universal, and former Chairman of the Board, Albert Johnson. Plaintiffs allege that Carpenter and Small took advantage of their status as ATF confidential informants to overvalue the assets of BSW/BSV at the time of the APA, sold tobacco products thereafter under the name "Big Sky" in violation of the APA and the noncompete agreements, conspired with USFC Vice President (and BSD President) Daniel and Board Chairman Johnson to hide these facts from the other members of the Plaintiffs' Board of Directors, and made payments to Daniel in exchange for his complicity (and not for his assistance with the IRS audit or to law enforcement). In addition to stating several claims for breach of contract against Carpenter, Small, BSW and BSV under state law, Plaintiffs brought claims under the federal RICO statute, 18 U.S.C. § 1962; state law claims under the North Carolina RICO Act, N.C. Gen. Stat. § 75D-4 and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1; and state law claims for fraud, fraud in the inducement, and civil conspiracy.

On November 10, 2016, District Judge James C. Fox, who was assigned the case at its inception, granted the Defendants' motion to substitute the United States as the party defendant for purposes of the Plaintiffs' state law tort claims under the Westfall

13

Act.[2]  On August 16, 2017, District Judge Terrence W. Boyle, who had been assigned the case upon the retirement of Judge Fox, reconsidered his predecessor's order and denied Defendants' motion.  Defendants appeal from this latter order.[3]

II.

The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn*, 549 U.S. at 229.  "When a federal employee is sued for wrongful or negligent conduct, the Act empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'"  *Id.* at 229-30 (quoting 28 U.S.C. § 2679(d)(1), (2)).  "Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee."  *Id.* at 230*; see also Maron v. United States*, 126 F.3d 317, 321 (4th Cir. 1997).

---

[2] The federal RICO claims and the breach of contract claims against Carpenter, Small, BSW and BSV, are not at issue in this appeal.  Nor are the Plaintiffs' claims against Defendants Daniel, Universal, and Johnson.  Nothing in this opinion should be construed as addressing any of these claims or the defendants with respect to these claims.  References to the "Defendants" hereinafter refer only to Carpenter, Small, BSW, BSV, and BSV d/b/a Big Sky.

[3] Unlike in the case of an order granting Westfall immunity, "[a]n order that conclusively denies a federal employee's request for substitution of the United States as defendant under the Westfall Act . . . is appealable under the collateral order doctrine because it is essentially a denial of a claim of absolute immunity."  *Jamison v. Wiley*, 14 F.3d 222, 230 n.10 (4th Cir. 1994) (emphasis omitted); *see also Osborn v. Haley*, 549 U.S. 225, 238 (2007).

If the Attorney General refuses to certify the defendant as an employee, the defendant may petition the court to find and certify that he was an employee acting within the scope of his employment. *See* 28 U.S.C. § 2679(d)(3). If the Attorney General issues the certification, or the district court grants the petition, the United States is substituted as the party defendant for those claims. *See* 28 U.S.C. § 2679(d)(4). The case then becomes one against the government under the Federal Tort Claims Act ("FTCA"), which provides a limited waiver of sovereign immunity from suit for money damages "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see United States v. Orleans*, 425 U.S. 807, 813 (1976).

A.  Federal Employee

An "[e]mployee of the government" for purposes of the Westfall Act includes "officers or employees of any federal agency" and "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. "[T]he term 'Federal Agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." *Id.* Thus, an "employee" for purposes of the Act need not have formal employee status. "As th[e] definition makes clear, even private

15

individuals who are not on the Government's payroll may be considered employees for purposes of establishing the Government's liability under the statute." *Patterson & Wilder Constr. Co. v. United States*, 226 F.3d 1269, 1274 (11th Cir. 2000). However, an "employee" does not include an "independent contractor" working for the government. *See* 28 U.S.C. § 2671; *Orleans*, 425 U.S. at 814.

The question of whether a defendant "is a government employee or an independent contractor under the Act . . . is a question of federal law." *Wood v. Standard Prods. Co.*, 671 F.2d 825, 829 (4th Cir. 1982); *see also Logue v. United States*, 412 U.S. 521, 528 (1973). "The test employed for distinguishing between a contractor and an employee for FTCA purposes was developed by the Supreme Court in *Logue* and *Orleans*." *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996). Although there are a number of factors than can be considered, "the critical factor in making th[e] determination is the authority" of the federal government "to control the detailed physical performance of the contractor." *Logue*, 412 U.S. at 527-28; *see also Orleans*, 425 U.S. at 814. Under these controlling authorities, a contractor can be said to be "an employee or agent of the United States within the intendment of the Act" "only where the Government has the power under the contract to supervise a contractor's 'day-to-day operations' and 'to control the detailed physical performance of the contractor." *Wood*, 671 F.2d at 829.[4]

---

[4] Although none are dispositive of the question, factors that courts may consider in making the determination include:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is (Continued)

"Notably, it is not necessary that the Government continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of the task." *Patterson*, 226 F.3d at 1274. "Primarily, th[e] distinction turns on 'the absence of *authority* in the principal to control the physical conduct of the contractor in performance of the contract'" with the government. *Robb*, 80 F.3d at 888 (quoting *Logue*, 412 U.S. at 527) (emphasis added); *see also Orleans*, 425 U.S. at 814 ("A critical element in distinguishing an agency from a contractor is the *power* of the Federal Government 'to control the detailed physical performance of the contractor.'" (quoting *Logue*, 412 U.S. at 528) (emphasis added). "It is the right to control, rather than the *actual exercise* of control, that is significant." *ARA Leisure Servs., Inc. v. NLRB*, 782 F.2d 456, 460 (4th Cir. 1986) (emphasis added).

## B.  Scope of Employment

engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business."

*Robb v. United States*, 80 F.3d 884, 889 n.5 (4th Cir. 1996) (quoting Restatement (Second) of Agency § 220(2)).

17

Separate from the question of whether a person is an "employee" is the question of whether he was acting within the scope of his employment when he committed the alleged tortious acts. This latter question is governed by the law of the state in which the alleged tort occurred. *See Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir. 1994).

Under North Carolina law, which the parties agree applies here, "an employer is liable to a third person injured by the wrongful act or neglect of his employee if, but only if, such act or omission occurred in the course of the employment; that is, while the employee was engaged in doing something he was employed, or otherwise authorized, to do for the defendant employer." *Wegner v. Delly-Land Delicatessen, Inc.*, 153 S.E.2d 804, 807 (N.C. 1967); *see also Troxler v. Charter Mandala Ctr., Inc.*, 365 S.E.2d 665, 668 (N.C. Ct. App. 1988) (The employee acts within the scope of his employment if the "employee, at the time of the incident, [was] acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment."). "If the act of the employee was a means or method of doing that which he was employed to do, though the act be wrongful or even forbidden, the employer is liable for the resulting injury, but he is not liable if the employee departed, however briefly, from his duties in order to accomplish a purpose of his own, which purpose was not incidental to the work he was employed to do." *Wegner*, 153 S.E.2d at 808; *see id.* 807-08 ("If the servant was engaged in performing the duties of his employment at the time he did the wrongful act which caused the injury, the employer is not absolved from liability by reason of the fact that the employee was also motivated by malice or ill will toward the person injured, or even by the fact that the employer had expressly forbidden him to commit such act.").

18

Thus, the question of whether a defendant was acting in the course and scope of his employment is ordinarily one for the factfinder, *see Medlin v. Bass*, 398 S.E.2d 460, 463 (N.C. 1990), and, in the context of a Westfall Act motion for substitution, the factfinder is the district judge. *See Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000); *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1154 (4th Cir. 1997). Courts must "look[] at the allegedly tortious act in context, rather than in a vacuum, in deciding whether it is within the scope of employment." *Maron*, 126 F.3d at 325. "Few government authorities are authorized to commit torts as part of their line of duty, but to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense." *Id.* (internal quotation marks omitted). This is because "[o]nce the wrongful acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available," and "the defense would apply only to conduct for which [it is] not needed." *Id.* (internal quotation marks omitted); *see also Wallen v. Domm*, 700 F.2d 124, 126 (4th Cir. 1983) (per curiam) ("[W]rongful activity incidental to an otherwise proper exercise of authority must fall within the immunity claim.").

III.

In their Westfall motion for substitution, Defendants asserted that they were "acting on behalf of [the ATF] in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," at the time of the alleged tortious conduct. 28 U.S.C. § 2671. Plaintiffs and the Government opposed the motion, asserting that Defendants were routine undercover informants acting as

19

independent contractors for ATF and, therefore, not entitled to immunity. Plaintiffs additionally argued that, even if Carpenter and Small were federal employees, they were acting outside the scope of their employment when they engaged in the alleged tortious acts. The Government has not joined in this asserted second basis for denying immunity.

A.

The question of whether a confidential informant acting on behalf of a federal law enforcement agency is a "federal employee" or an "independent contractor" presents a unique set of circumstances for consideration in each such case and is one that does not fit neatly into our precedents. Moreover, the Plaintiffs and the Government acknowledge that Carpenter's and Small's extensive activities on behalf of law enforcement present an even more unusual and complicated case. However, while we have not squarely considered the question before, we are not without some guidance.

Generally speaking, other courts have recognized that a "run of the mill" informant for a law enforcement agency will not likely meet the criteria to be deemed a government employee within the meaning of the Act. *See Wang v. Horio*, 45 F.3d 1362, 1364 (9th Cir. 1994). Thus, for example, in *Slagle v. United States*, the Ninth Circuit affirmed the district judge's decision to deny employee status to an informant who, as part of his activities in running a nonprofit community service project with the goal of reducing drug abuse, "volunteered to make himself available as [a drug] informant" for pay "on a per job basis." 612 F.2d 1157, 1158 (9th Cir. 1980). "Apart from [very] general guidelines," such as a prohibition against carrying a gun and requiring the informant to notify police before contacting a source, the informant "had very broad

20

discretion over the details of his informant activities." *Id.* Noting the "general [rule that] the activities of an informant are not subject to the actual control or right of control of a federal agent," the Ninth Circuit affirmed because "[t]he facts of the case indicate[d] that the[se] agents had no right of control nor actual control of" the informant. *Id.* at 1161.

There is, however, nothing in the language of the Act that would categorically preclude confidential informants from being designated federal employees if the facts bear out that they were "acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," and not as an independent contractor, when they engaged in their undercover activities. 28 U.S.C. § 2671. Thus, in *Leaf v. United States*, the Ninth Circuit distinguished *Slagle* and affirmed the district judge's finding that a confidential informant *was* an employee under the Act because "[t]he record disclose[d] a man who [was] not the run-of-the-mill informant who is used to buy and sell drugs, generally out of fear of arrest or prosecution if he does not cooperate with the government." 661 F.2d 740, 741 (9th Cir. 1981). Rather, the employee was a DEA informant on a covert mission as a pilot at the time of the alleged tortious acts, who "was excited by the prospect of adventure," "offered his services as a citizen," and "was under no threat of criminal prosecution." *Id.* "By profession he rebuilt helicopters, he had a private pilot's license, and he had contacts with others in the aircraft trade. Presumably, because of this he was sought out by drug smugglers." *Id.* Although noting that "[a]nother trier of fact might have come to a different result," the court held that the district judge, as the "trier of fact [had] found agency and [the court could not] say the record d[id] not support him." *Id.*

21

Similarly, in *Wang v. Horio*, the district judge addressed these controlling precedents and found that a financial consultant who approached the IRS in connection with one of his clients and thereafter acted as an IRS informant was an "employee" based upon the control exercised by the IRS, even though the IRS told him that he "was not to be considered an employee of the government" and he was not compensated for his services. 741 F. Supp. 1373, 1378 (N.D. Cal. 1989), *aff'd in part and rev'd in part*, 947 F.2d 1400 (9th Cir. 1991); *cf. Wang*, 45 F.3d at 1364 (holding that, although "ultimately judged to be erroneous by the district court, the government's position that [the IRS informant] was not an employee was 'substantially justified'" for purposes of the Equal Access to Justice Act).

The Eleventh Circuit reached a similar conclusion in the context of "alleged misconduct of private parties hired by federal agents to conduct covert law enforcement activities." *Patterson*, 226 F.3d at 1270. Looking at the operation as a whole, and despite the fact that there was evidence that the agency did not control all of the day-to-day aspects of the operation, the court held that there was sufficient evidence upon which the factfinder could conclude that "the alleged tortfeasors were 'employees' of the Government within the meaning of the FTCA." *Id.* at 1274.

As these cases make clear, the questions of whether a confidential informant is a federal employee under the Act and whether the informant was acting within the scope of his employment are factual in nature, just as in any other Westfall Act proceeding. But due to the unique role that confidential informants play in law enforcement activities, the issues are closely related. *See Wang*, 741 F. Supp. at 1378 (noting that "[a]lthough . . .

22

those two issues involve slightly different analyses, the issues are closely related in the context of [a] case" involving confidential informants).

"At all stages of the process, it is for the district court to weigh the sufficiency of the evidence, to determine whether genuine issues of fact exist, and ultimately to resolve these factual issues." *Borneman*, 213 F.3d at 827; *see also Gutierrez*, 111 F.3d at 1154 "Once any factual issues are resolved, the district court must then proceed to weigh the evidence on each side to determine whether" substitution should be granted. *Id.* As part of the process of determining whether certification is proper under the Act, it will sometimes be "advisable for the trial court to permit limited discovery or conduct an evidentiary hearing to resolve competing factual claims concerning the scope-of-employment issue." *Id.* We have recognized that a quick resolution of Westfall Act immunity issues is "desirab[le] . . . because immunity under the Westfall Act, like other forms of absolute and qualified immunity, is an *immunity from suit* rather than a mere defense to liability." *Id.* (internal quotation marks omitted). Therefore, "district court[s] should remain cognizant of the considerations weighing against protracted litigation under the Westfall Act." *Id.*

With these principles in mind, we turn now to consider the respective district court orders at issue in this appeal—Judge Fox's order granting Defendants' motion to substitute the Government as the party defendant for purposes of the state tort law claims brought against them and Judge Boyle's order reconsidering that decision and denying Defendants' petition to substitute.

B. The Substitution Order

23

On November 7, 2016, following an evidentiary hearing, Judge Fox found that Carpenter and Small were "*de facto* federal agents" who were acting within the scope of their employment when they engaged in the alleged tortious acts. J.A. 458. Addressing first the question of whether Defendants were federal employees at the time of the events in question, Judge Fox found as follows:

> Here, Defendants' law enforcement activities clearly exceeded those of the run-of-the-mill informant. Defendants' Government cooperation spanned approximately seven years and supported multiple federal agencies nationwide. In fact, Defendants' ATF handler, Agent Tom Lesnak, testified that at one point Defendants were involved in investigations tied to every ATF field office in the country. Defendants assisted international and domestic investigations into tobacco trafficking and other serious crimes. Defendants' covert activities included not only purchasing and selling tobacco products on behalf of the Government, but also developing close relationships within the tobacco industry. Defendants built trust with targets and potential targets over the course of multiple transactions and interactions. In one instance, Defendants travelled internationally to meet with a particularly sensitive target at the behest of the Government. It is clear that Defendants Carpenter and Small were not typical informants, making a few controlled buys or handing over information already in their possession. Rather, Defendants, for years, acted as *de facto* federal agents, conducting the type of undercover investigation and asset development normally the responsibility of an actual agent.

> Defendants' undercover work was at the direction and supervision of their Government handlers. The Government dictated from whom Defendants bought tobacco products and to whom they sold. The Government also set the prices for each transaction and determined into which bank account the proceeds would be deposited. Further, although Defendants Carpenter and Small owned and managed the "management account" into which much of the proceeds were deposited, they did so with the understanding that the Government would perform an accounting at the conclusion of each investigation and determine whether, and in what amount, Defendants were entitled to payment.

J.A. 457-58 (footnotes omitted). Based on the evidence and his factual findings, Judge Fox was "convinced that Defendants' unusually extensive activities on behalf of multiple

federal agencies elevate their status beyond the run-of-the mill informant *and* that they were sufficiently controlled by their Government handlers to qualify as federal employees." J.A. 459 (emphasis added).

Turning to the second question, Judge Fox found that Defendants' alleged tortious acts took place within the scope of their employment. With regard to the Defendants' inventory valuation at the time of the APA, Judge Fox found as follows:

> [P]art of [BSV's] inventory included tobacco products acquired in connection with ATF investigations. The true cost of these products—and the amount reported to Plaintiffs—included not only the base purchase price, but also additional costs associated with their acquisition. The amount to be added to the base price, and therefore the total valuation reported to Plaintiffs, was dictated by Agent Lesnak.

J.A. 461 (footnotes omitted). In addition to testimony offered by Small regarding the valuations, Judge Fox also credited Agent Lesnak's testimony that "the Government needed to 'make sure we reconciled our inventory and that at the acquisition . . . the government-purchased inventory was paid back to the government.'" J.A. 462.

> When asked whether the price reported to Plaintiffs accurately reflected the cost of the product to Defendants, Lesnak responded "that's what the government was owed and that's what the government obviously got to make sure our inventory was zero." The evidence shows that the products that are the subject of disputed valuations were acquired on behalf of the Government and the Government controlled the cost reported for those products.

J.A. 462 (footnote omitted). In light of this "testimony, the court [was] persuaded that Defendants were acting in their capacity as federal employees when they reported the value of their inventory to Plaintiffs." J.A. 462.

With regard to Defendants' acquisition and sale of tobacco products under the Big Sky umbrella after the APA was executed, Judge Fox found as follows:

> Both before and after the close of the APA, Defendants were tasked by the Government with "buying, selling and trading with the targets" of the ATF's investigations. According to Agent Lesnak, the tobacco products purchased on behalf of the ATF "had to move" for Defendants to accomplish the goals of the investigation. Defendant Carpenter testified that, as had been the case prior to the APA, Defendants were instructed by Agent Lesnak to distribute some tobacco products to specific targets or undercover agents and to "sell the balance of the product to [BSD] or anyone else that we got authorization to sell the product to." Agent Lesnak acknowledged that he was aware that Defendants would continue to sell products to Plaintiffs after May 1, 2011, and that such sales were part of the ATF's plan. Further, with regard to those sales, Agent Lesnak continued to set the prices as he had done prior to the close of the APA.

J.A. 462-63 (footnotes omitted). Thus, "the Government was not only aware of Defendant's continuing sales of tobacco products to the Plaintiffs after the close of the APA, but that these sales were an integral part of ATF investigations." J.A. 463.

Finally, with regard to Defendants' payments to Vice-President Daniel, Judge Fox found that they too were within the scope of the undercover operation.

> Defendants Carpenter and Small testified that Agent Lesnak instructed them to pay Defendant Daniel for his cooperation with the Government. Defendant Small categorized the payments to Defendant Daniel as examples of the "checks [they wrote] on behalf of law enforcement, for law enforcement, and towards law enforcement." With regard to specific payments, Defendant Small testified that at least one payment to Daniel, made the day after the closing of the APA in the amount of $69,066.67 was a "payment of deferred income . . . related to two cases that were yet to be adjudicated and hadn't been reconciled." Addressing other post-APA payments, Defendant Small further testified that Agent Lesnak "was definitely involved in the decision to pay Mr. Daniel," and that these payments were in exchange for "services. He was helping the ATF and [other federal agencies]." Defendant Daniel also testified that the payments he received from Defendants Carpenter and Small were "from the government for the work [he] had done for them." Although Agent Lesnak

26

does not admit having given a specific instruction to pay Defendant Daniel, his account of the conversation with Defendants Carpenter and Small generally corroborates their testimony.

J.A. 463-64 (footnotes omitted).

In sum, Judge Fox credited the testimony of Carpenter, Small, Daniel, Agent Lesnak, and Agent Whittemore, and found that Carpenter and Small were federal employees acting within the scope of their employment at the time of the alleged tortious activities. Accordingly, Judge Fox granted the petition to substitute and, thereafter, denied Plaintiffs' motion to reconsider and to certify an interlocutory appeal.

## C. The Reconsideration Order

After the case was reassigned, Judge Boyle indicated at a status conference that he might vacate Judge Fox's substitution order. On June 27, 2017, Plaintiffs filed a "Renewed Motion to Reconsider," based upon "newly discovered evidence" of "an April 2011 memorandum from [ATF] setting forth guidance applicable to churning investigations." J.A. 508. Plaintiffs asserted that the memorandum established that Carpenter and Small had violated federal law, and exceeded their authority, "by churning funds from one operation into others." J.A. 508-09.

The Government supported reconsideration of Judge Fox's order, but disagreed with the basis offered by Plaintiffs. The Government asserted instead that the court should reconsider the order for the same reason that it had previously advanced to Judge Fox—that Defendants were "run-of-the-mill" informants and not "federal employees" within the meaning of the Act at the time of the activities in question, rendering the "scope of employment inquiry" unnecessary.

27

On August 16, 2017, without conducting an evidentiary hearing or receiving any additional evidence, Judge Boyle granted Plaintiffs' renewed motion for reconsideration, denied Defendants' petition to substitute, and dismissed the Government from the case. After "review[ing] the record and the filings of the parties," Judge Boyle credited portions of the declarations and testimony of ATF Special Agent Ryan Kaye, and found as follows:

> Absent from this case is evidence that the government, through its ATF or other agents, had the authority to control the daily actions of Carpenter or Small; while Carpenter and Small may have voluntarily done everything ATF agents asked, that does not mean that the ATF had the power to coerce these defendants into doing things against their will.
>
> During the time frame relevant to plaintiffs' claims, Carpenter and Small were employed and paid a salary by plaintiffs. Carpenter and Small were not on the government payroll and received no direct compensation for their services. Rather, Carpenter and Small retained proceeds from their own cigarette business independent from their activities with the ATF, but the ATF never paid them compensation for their activities engaging with targets of government investigation. Only when Carpenter and Small sold tobacco products in an ATF investigation did ATF set the price of the tobacco products; all prices for tobacco products sold as a part of Carpenter and Small's tobacco distribution business were set by Carpenter and Small. The confidential informant contract signed by Carpenter expressly stated he was not a government employee and Small never had a written agreement with the ATF.
>
> [T]he Court is simply unconvinced that, although they were much more than defendants who conducted a few drug buys, Carpenter and Small were anything more than informants. Indeed, [defendants] were approached by the ATF *because* of their legitimate tobacco business, and while there is certainly evidence that ATF controlled Carpenter and Smalls' actions related to [ATF] targets, there is no evidence that the ATF or any other governmental agency exerted control over all of their business dealings; more specifically, the ATF has denied involvement in those dealings with the claims in plaintiffs' complaint relating to the sale of cigarettes from defendant Big Sky to plaintiff Big South Distribution.

28

Here, plaintiffs' claims simply do not arise out of any activity which was undertaken at the direction of the ATF in relation to cigarette smuggling or other targets. Further, while not dispositive of the inquiry, [defendants] received no fixed salary from the government, and the Court is unaware of any evidence that [Defendants] could not have refused the call for assistance at any time.

J.A. 626-28 (citations and internal quotation marks omitted). Turning to the "scope of employment" inquiry, Judge Boyle again took a view of the evidence that differed from that of Judge Fox.

Relatedly, the Court now holds that at the time of the incidents which form the basis of plaintiffs' claims, Carpenter and Small were not acting within the scope of any alleged employment by the ATF. The government has expressly disavowed that it had any control over Carpenter and Smalls' legitimate business operations, and Carpenter and Small's attempts to paint every action they undertook in relation to the cigarette business as having been undertaken as an employee of the federal government fails. Again, Carpenter and Small were not recruited by the ATF to act as sworn undercover agents nor were they the subject of any letters of marque; rather, their position and presence in the legitimate tobacco business made them prime suspects for recruitment as *informants*, and any activities by Carpenter and Small which did not concern their work to gain information or engage in dealings with known or potential targets of government investigation, which it is undisputed that plaintiffs were not, cannot be considered as having taken place within the scope of any government employment. To the extent Carpenter and Small claim that all of their activities relating to plaintiffs were at the direction of their ATF handler, the ATF April 2011 memorandum regarding its churning policy relied upon by plaintiff demonstrates that many of these actions would have been in violation of ATF's own policy and therefore outside Carpenter['s] and Small's limited scope of employment or office.

J.A. 628-29 (citation omitted).[5] This interlocutory appeal from Judge Boyle's reconsideration order followed.

---

[5] Special Agent Kaye stated that the Defendants "set all pricing for tobacco products sold as part of their *pre-existing,* legitimate tobacco distribution business" and (Continued)

Ordinarily, we "review for clear error the factual conclusions reached by the district court" on a Westfall motion, and "the ultimate determination of whether those facts require a finding that the alleged torts were within the scope of employment . . . *de novo*." *Maron*, 126 F.3d at 326 n.8. In this appeal, however, we are reviewing Judge Boyle's decision to reconsider Judge Fox's earlier order granting the Westfall motion. We review that decision for an abuse of discretion under the standards that govern a motion under Rule 54(b) of the Federal Rules of Civil Procedure. *See Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).[6]

---

that "ATF set the prices at which [defendants] could sell tobacco products only when those cigarettes were involved in an ATF law enforcement investigation." J.A. 451 (emphasis added). Plaintiffs' allegations in this regard pertained solely to the acquisition and sale of tobacco products *after* Carpenter and Small sold their legitimate tobacco distribution businesses to Plaintiffs. These transactions took place under the "Big Sky" umbrella, which Special Agent Lesnak understood to be 100% related to law enforcement. With regard to Judge Boyle's view that ATF lacked the requisite control because Carpenter and Small acted voluntarily and ATF lacked "the power to coerce [them] into doing things at their will," J.A. 626 (internal quotation marks omitted), we have never held that employee status is dependent upon whether an employer can "coerce" an individual to act. And the fact that a confidential informant acts voluntarily, and not under threat of criminal prosecution, would tilt towards a finding that they are *not* "run of the mill" informants. *See Patterson & Wilder Constr. Co. v. United States*, 226 F.3d 1269, 1274 (11th Cir. 2000); *Leaf v. United States*, 661 F.2d 740, 741 (9th Cir. 1981); *Wang*, 741 F. Supp. 1373, 1378-79 (N.D. Cal. 1989).

[6] Plaintiffs agree that the "abuse of discretion" standard applies to a Rule 54(b) decision, but argue that Defendants waived the right to argue that Judge Boyle abused his discretion because Defendants only raised the "abuse of discretion" standard in a footnote. *See Appellees' Brief* at 48 (citing *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015)). However, it is always the duty of our court to apply the proper standard of review to a district court's decision, without regard to the (Continued)

Under Rule 54(b), "a district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). "Compared to motions to reconsider *final* judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light." *Carlson*, 856 F.3d at 325.

Nevertheless, the discretion afforded by Rule 54(b) "is not limitless," and we "have cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *Id.* This is because, while Rule 54(b) "gives a district court discretion to revisit earlier rulings in the same case," such discretion is "subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks omitted).

---

parties' arguments or their agreements to the contrary. *See United States v. Fonseca*, 744 F.3d 674, 682 (10th Cir. 2014) ("'[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived.'" (quoting *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001)); *United States v. Bain*, 586 F.3d 634, 639 (8th Cir. 2009) (per curiam) ("A party's concession on the standard of review does not bind the court, as such a determination remains for this court to make for itself.") (internal quotation marks omitted); *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996) (The parties . . . cannot determine this court's standard of review by agreement. Such a determination remains for this court to make for itself.").

Accordingly, "a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: "(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice. *Carlson*, 856 F.3d at 325 (internal quotation marks and alteration omitted). "This standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e), but it departs from such standard by accounting for potentially different evidence discovered during litigation as opposed to the discovery of new evidence not available at trial." *Id.* (internal quotation marks omitted). Moreover, "where, as here, the order was entered by one judge and then reviewed by another, . . . the latter judge should be hesitant to overrule the earlier determination." *Id.* (internal quotation marks omitted).

V.

Here, there is no claim of an "intervening change in the law" warranting reconsideration of Judge Fox's substitution order. Thus, we must decide whether Judge Boyle's decision is supported by (1) "substantially different evidence" discovered during litigation that justifies a different outcome; or (2) a determination that Judge Fox's decision amounted to "clear error causing manifest injustice." *Id.* (internal quotation marks omitted); *see also American Canoe*, 326 F.3d at 515.

A.  Clear Error Causing Manifest Injustice

We begin with the question of whether Judge Boyle properly exercised his discretion to overturn Judge Fox's decision based upon the "clear error causing manifest injustice" exception. We conclude that he did not.

32

First, Judge Boyle did not conclude that Judge Fox's decision inflicted clear error causing manifest injustice at all. Although Judge Boyle noted the three acceptable "law of the case" bases for revisiting an interlocutory order at the outset of his order, he did not explicitly ground his decision in any of them. Rather, he appears to have instead credited the testimony and sworn statements of different witnesses to reach different factual findings from those of Judge Fox, who actually saw and heard the witnesses. This was error.

As noted above, Judge Fox reviewed the entirety of the evidence, held an evidentiary hearing, and credited the testimony of Carpenter, Small, Daniels, Agent Lesnak, and Agent Whittemore to find that Carpenter and Small were government agents who were acting within the scope of their employment. Collectively, these witnesses provided testimony sufficient to support Judge Fox's factual findings that Carpenter and Small were sufficiently controlled by, and subject to the control of, the ATF, and that their alleged tortious activities were authorized by and within the scope of their duties as undercover agents, so as to be found to be federal employees acting in an official capacity on behalf of the United States for purposes of the Act.

Judge Boyle, in contrast, placed emphasis upon the declarations and testimony of Special Agent Kaye, and the Government's official position that it did not control the day-to-day activities of the two men. Having done so, he found that (1) Carpenter and Small were not sufficiently supervised and directed by their ATF handlers to be deemed federal employees and (2) Carpenter's and Small's cigarette sales to non-targets were outside the scope of their employment. But even if we were to conclude that Judge

33

Boyle's contrary factual findings are supported by different or other evidence in the record, he was not at liberty to reach them under the Rule 54(b) standards that cabined his discretion. Such a blanket *de novo* review of factual determinations is not appropriate when addressing a motion to reconsider, and this is all the more true when addressing a motion to reconsider a substitution order under the Westfall Act that was issued by a different district judge. *Borneman*, 213 F.3d at 827 ("[D]istrict court[s] should remain cognizant of the considerations weighing against protracted litigation under the Westfall Act."); *Carlson*, 856 F.3d at 325 ("[W]here, as here, 'the order was entered by one judge and then reviewed by another,' courts have held that the latter judge should be hesitant to overrule the earlier determination.").

Second, even if we were to assume that Judge Boyle *implicitly* concluded that Judge Fox's decision amounted to clear error causing manifest injustice, it was an abuse of discretion to grant the Plaintiffs' renewed motion to reconsider on this basis. As we have noted on more than one occasion, "[a] prior decision does not qualify for th[e] third exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (internal quotation marks, citations, and alteration omitted); *see also United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 657 n.6. (4th Cir. 2015); *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). Judge Fox's order did no such thing.

To be sure, there were conflicting views in the record pertaining to the extent of the day-to-day supervision and direction that was provided to Carpenter and Small regarding the scope of the undercover operations. But it was the province of Judge Fox to review the record and make the requisite factual findings when he considered the Westfall motion in the first instance, and it was the duty of Judge Boyle to respect those factual findings and cabin his review of the reconsideration request to the Rule 54(b) bases for overturning the prior decision. *Cf. Leaf*, 661 F.2d at 741 ("Another trier of fact might have come to a different result, but this trier of fact found agency and we cannot say the record does not support him."). Having reviewed the record, we are more than satisfied that Judge Fox's factual findings regarding ATF's power and authority to supervise and direct Carpenter and Small in their undercover activities—"which depended critically on the district court's assessment of the relative credibility of the witnesses"—were not clearly erroneous, *Jamison*, 14 F.3d at 237, nor did his order of substitution inflict a manifest injustice upon the Plaintiffs or the Government. Therefore, we hold that Judge Boyle abused his discretion in granting the motion for reconsideration on this basis.[7]

---

[7] The Government has requested in the alternative that we now remand to allow the Attorney General to make a determination of whether Carpenter and Small were acting within the scope of their employment. We decline to do so. Defendants filed the petition for substitution because the Attorney General failed to timely act on their request for certification. The Government thereafter opposed the petition, but solely on the ground that Defendants were not "federal employees" within the meaning of the Act. And when the Plaintiffs filed their renewed motion for reconsideration in the district court based upon the scope-of-employment prong, the Government affirmatively disagreed with Plaintiffs' basis for reconsideration and opted instead to raise only the
(Continued)

## B. Substantially Different Evidence

We turn now to the question of whether the ATF churning memorandum that was offered by Plaintiffs as "new evidence" in support of their renewed motion for reconsideration is a sufficient basis upon which to affirm Judge Boyle's order. We conclude that it is not.

As an initial premise, we again note that although Judge Boyle briefly referenced the memorandum at the end of his decision pertaining to the scope-of-employment prong, he did not ground his decision on this basis. Plaintiffs have also acknowledged that "the district court's final order does not depend on that memorandum." *See* Appellee's Brief at 54. And with good reason. The memorandum, which was submitted in support of Plaintiffs' claim that the Defendants' post-APA tobacco transactions were not within the scope of their employment, falls far short of the "substantially different evidence" that would warrant overturning Judge Fox's prior decision under the Rule 54(b) standards.

When Judge Fox issued his order, the propriety of Carpenter's and Small's use of the management accounts to hold "non-target" funds after the APA was executed was already the subject of extensive testimony and official agency declarations. Judge Fox specifically considered this evidence, credited the testimony of Carpenter, Small, and the

---

same argument that they had raised before Judge Fox. Although the Government was free to confine its opposition to the petition on whatever grounds it saw fit, it is beyond question that the scope-of-employment issue was squarely presented before Judge Fox twice, and to Judge Boyle on a third occasion. Consequently, the Government cannot plausibly assert that it has been deprived of an opportunity to weigh in on the question or that we should further delay a Westfall Act determination so that they can do so now.

ATF agents that supervised and worked alongside them, and found that Defendants' use of the management accounts was at the direction of ATF and within the scope of their employment.

> Plaintiffs argue that Defendants' conduct exceeded the proper authority of the ATF, and therefore must have exceeded the scope of their employment. During the August 24, 2016 evidentiary hearing, and throughout their briefing on this issue, Plaintiffs have cast doubt on the propriety of the ATF's investigative techniques. Plaintiffs question whether the agency's use of a management account is authorized, whether the agency may use a private citizen to backstop its operations, and whether the agency has the authority to order large payments to its confidential informants and witnesses. These questions, while understandable, miss the point. Government agencies are imperfect. A Government employee might very well exceed the bounds of his agency's authority, and in doing so, commit a tort. If is conduct is a means of accomplishing the work he is assigned to do, however, the wronged party's recourse is with the Government. The court's conclusion here is neither an endorsement nor an indictment of Defendants' and the Government's actions in this case, the merits of which are not before the court at this time. The court simply concludes that the conduct Plaintiffs complain of appears, by a preponderance of the evidence, to have been undertaken in support of Defendants' work for the Government.

J.A. 464.

In sum, the churning memorandum adds little to the evidence already considered by Judge Fox and it certainly did not require a contrary factual determination of "scope of employment" under North Carolina law. As Judge Fox understood, an employee acts within the scope of his employment if his conduct is "a means or method of doing that which he [is] employed to do," even if the specific conduct at issue is "wrongful and unauthorized or even forbidden." *Wegner,* 153 S.E.2d at 807-08 (1967); *see also Wallen,* 700 F.2d at 125 (affirming dismissal of claim against plaintiff's supervisor despite plaintiff's argument that supervisor "was not authorized to assault his subordinates");

37

*Maron*, 126 F.3d at 326-27 ("unsubstantiated speculation about the ill will" or "malicious motive" of plaintiff's colleagues does not "transform acts which are facially within the scope of employment into acts that fall outside of that scope"). Here, Defendants' use of the management accounts was with the knowledge, direction, and supervision of the ATF and their primary ATF handler. Even if ATF and Defendants violated the policies set forth in the churning memorandum by depositing funds generated by the "non-target" transactions into the management accounts and using a portion of those funds to "backstop" other law enforcement operations at the direction of their ATF handlers, Carpenter and Small did not cease to act within the scope of their employment when they did so.

## VI.

For the foregoing reasons, we hold that the district court abused its discretion in granting Plaintiffs' motion for reconsideration of the Westfall substitution order. Accordingly, we vacate the district court's order granting reconsideration under Rule 54(b) and remand with instructions to reinstate the prior order granting Defendants' petition to substitute.[8]

---

[8] As an alternative, Plaintiffs have requested that we affirm Judge Boyle's decision insofar as it applies to Defendants BSW and BSV because they are artificial entities. Defendants counter that this is a distinction without any practical difference because, based upon the testimony of the witnesses credited by Judge Fox and his factual findings, any liability of BSW and BSV would be wholly derivative from the alleged tortious acts for which Carpenter and Small enjoy absolute immunity. As Plaintiffs point out, Judge Fox's order of substitution separately addressed each of the alleged tortious actions taken by Carpenter and Small and included BSW and BSV in the order. In his reconsideration order, however, Judge Boyle did not address the question of whether substitution was (Continued)

---

appropriate for BSW and BSV and focused his decision solely on the post-APA transactions that were conducted under the Big Sky name and while Carpenter and Small were working with BSD. Nevertheless, even assuming that the question is properly raised before us, we cannot say that Judge Fox's decision to include BSW and BSV d/b/a Big Sky in the substitution order rises to the level of clear error causing manifest injustice. Nor was there substantially different evidence discovered during litigation upon which to exclude BSW and BSV from Judge Fox's order.